Filed 5/16/13  P. v. Randolph CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL LEVETTE RANDOLPH et al.,<br><br>    Defendants and Appellants. | B234204<br><br>(Los Angeles County<br>Super. Ct. No. BA355498) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald S. Coen, Judge.  Affirmed.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant Michael Levette Randolph.

Rodger Paul Curnow, under appointment by the Court of Appeal, for Defendant and Appellant Giovany Zamora-Smith.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Erika D. Jackson, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury found defendants and appellants Giovany Antonio Zamora-Smith and Michael Levette Randolph guilty of one count of first degree murder and two counts of premeditated, willful and deliberate attempted murder. On appeal, they challenge their convictions and Randolph additionally challenges his sentence. We reject all contentions and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Factual background.

#### A. *Prosecution case.*

On the evening of December 30, 2008, David Warner was visiting his children and their mother, who lived on Stevely Avenue, near August Street in Los Angeles. Around 11:00 p.m., Warner and his friend, Christopher Gonzalez, left. While walking to the bus stop, Warner's childhood friend, Kasseim Bing, joined them. The three men did not have weapons.

At the intersection of August and Stevely, an area associated with the Black P-Stones Blood gang, a burgundy Dodge Magnum with chrome rims pulled alongside them. Three people were in the car. The front passenger was a "dark-skinned Black guy" wearing a tank top, and Warner "thought he had braids." The man asked, " 'What's up, Blood?' " and he gave a Black P-Stone gang sign. Warner, himself a Black P-Stone, was leery of the man, because he did not recognize him and because the man didn't use Warner's gang moniker, Kapone.

Bing, however, said, " 'What's up?' " A man wearing a gray sweatshirt with the hood pulled over his face and the strings down jumped from the back seat with a gun in his hand and asked, hostility in his voice, " 'What's up, homies[?]' "[1] The man "sounded Black." When the man started shooting, Warner and Gonzalez ran. Bing, shot multiple times, died at the scene.

---

[1] At trial, Warner could not recall whether the man had facial hair, but he might have told Detective Yoshida the man had a thin mustache.

Warner ran to an alley and climbed on top of a parking stall where he sat and smoked a cigarette to calm himself. He saw the Dodge Magnum, driving fast, head north on Stevely then east on Coliseum.

Shot in the chest, Gonzalez ran to an apartment building, where Los Angeles Police Department (L.A.P.D.) Officers Alfredo Morales and Justin Peters found him. Gonzalez told Officer Morales that the car involved in the shooting was a maroon Dodge Magnum with large chrome rims. He did not mention a broken headlight. Gonzalez told Officer Peters that there were two Black men. The shooter wore a gray hooded sweatshirt and sat in the backseat of the car. The front passenger had cornrows or braids. Gonzalez could not describe the driver.

At 11:16 p.m., a 911 caller reported a shooting on Stevely and Coliseum. The caller saw a "burgundy, um charger . . . Magnum. I think it was a magnum. I think it was something like that those new cars that just came out." The driver was a "[B]lack guy with some braids." The caller also said that the car went "toward . . . Coliseum, towards Crenshaw way."

At 11:20 p.m., L.A.P.D. Officer Mark Burdine, a tactical flight officer assigned to the air support division, received a call that a shooting occurred in the area of August and Stevely. Within five minutes of that call, the officer saw a burgundy or maroon Dodge Magnum with chrome wheels and a right front passenger headlight that was out traveling eastbound of Santa Rosalia, within two to three blocks of the crime scene. Officer Burdine did not notice any other maroon Magnums on the street. He maintained continuous visual contact with the car until its occupants were taken into custody. The car did not make any erratic maneuvers. It stopped at all stop signs and appeared to obey the speed limit. The officer did not see anything thrown from the car.

On receiving a call of a shooting, L.A.P.D. Officer Keith Pak and his partner, Cirrito, drove to the area of the shooting. While on Martin Luther King approaching Crenshaw Boulevard, Officer Pak saw a maroon Dodge Magnum stop at Crenshaw and Martin Luther King to make a right turn. The officers followed that car and stopped it at

3

11th Avenue.[2] Officer Pak didn't see anything thrown from the car while he was following it.

According to Officer Pak, Zamora-Smith was driving the car and Randolph was in the front passenger seat. But Officer John Davis testified that Randolph was in the back seat, and nobody sat in the front passenger seat.

In the car were two cell phones and a blue Kansas City baseball cap with "K.C." on it. A gray hooded sweatshirt and other clothes were in the trunk or hatchback. No guns, bullets, or holsters were found in the car. No gunshot residue testing was conducted. Two different caliber casings were recovered from the scene: 12 casings were .40 caliber and five were .380 caliber. Thus, two different guns were used during the shooting.[3]

Zamora-Smith told Officer Pak that he had picked up Randolph at Degnan and Stocker, and they were " 'on the way to go see my bitch's house.' " Zamora-Smith said he was a Rollin 40's Neighborhood Crips gang member known as "P. Boy" or "Pretty Boy." Randolph also said he was from Rollin 40's, and his moniker was "Little Nut." Zamora-Smith wore a brown jacket and Randolph wore just a T-shirt. When Randolph said he was cold, L.A.P.D. Sergeant James Huett handed the gray sweatshirt to him, but Randolph didn't want it, saying it wasn't his.

While detained in a patrol car, Zamora-Smith and Randolph were surreptitiously recorded. During their conversation, Randolph told Zamora-Smith, "That's not my jacket. Don't tell them it[']s mine. Just don't tell them it[']s mine. Ain't nothing bro, ain't nothing on that jacket don't tell them."

At a field show-up, Warner identified the car as the one he saw earlier that night. He could not identify Randolph, even though he wore a gray hooded sweatshirt that an officer had put on him. Warner told Officer Peters that Randolph was of a similar height

---

[2]    The area in which the car was stopped, on 11th Avenue, is a Rollin 40's Crip hangout.

[3]    Six months after these crimes occurred, Anthony Cage was shot. The bullet that killed Cage was fired from the same .380 caliber gun that killed Bing.

and complexion to the shooter. He told L.A.P.D. Detective James Yoshida that the driver was light-skinned, "lighter than me," and therefore he was either a "light-skinned Black person or could have been Hispanic."

But at trial, Warner could not recall describing the driver as Hispanic. He could not identify Randolph or Zamora-Smith. At a prior hearing, Warner said that the shooter was taller than him. Randolph, however, is shorter than Warner.

FBI Special Agent Victor Nguyen, a member of the cellular analysis survey team, testified. Using a cell phone's "call detail records," he can determine where a phone was at a point in time. A cell tower is a physical structure containing cell sites made of antennas pointed in a specific direction to provide cellular coverage or service. The call detail record shows what cell site a cell phone used each time a call was made to or from the phone.

Agent Nguyen reviewed the cell phone records connected to the T-mobile cell phone found in the car. At 11:06 p.m., on December 30, 2008, the phone used a cell site that was within .3 miles of August and Stevely, where the shooting took place. The furthest a person could be from where the shooting took place and still be within that cell site is approximately .3 miles. The same cell site was used at 11:22 p.m.

L.A.P.D. Officer Matthew Courtney, the People's gang expert, testified about the Rollin 40's Crips gang. Tattoos associated with the gang include "F-C," "R-F-C-G," "R-F-C," and four leaf clovers. Zamora-Smith has a tattoo of a four-leaf clover with "RFC" over it.

The Black P-Stones are a rival gang, and their territory borders Rollin 40's territory. The Black P-Stones hang out at The Jungle, an area between Crenshaw, Martin Luther King, La Brea and Stocker. August and Stevely is in The Jungle, the heart of Black P-Stone territory.

In the officer's opinion, Zamora-Smith is a Rollin 40's gang member known as "P-Boy" or "Pretty Boy." Randolph is also a Rollin 40's gang member known as "Bit Nut" or "Nut." If two Rollin 40's gang members went to August and Stevely, they would most likely be armed and be there to "put in work," meaning, to commit a crime. Gang

5

members earn respect within the gang by committing drive-by shootings, and such crimes intimidate and scare the community. It's common for more than one gang member to participate in a drive-by shooting: someone needs to drive and one or two people are the shooters.

Gangs also have a system for hiding the weapons they use to commit their crimes: after a shooting, they go to a safe house or location and hide the guns there. Cars also have hidden compartments to conceal weapons. It's also common for one member of a shooting to leave the car with the weapons. Guns are recycled for use in other shootings.

Based on a hypothetical modeled on the facts of this case, the gang expert said the crime was committed for the benefit of, in association with or at the direction of the Rollin 40's gang.

B. *Defense case.*

Before the field show-up, an officer put a grey sweatshirt on Randolph and put the hood up.

Marc Scott Taylor, who runs a laboratory specializing in crime scene reconstruction, testified about gunshot residue. He would expect gunshot residue to be on the hand of someone who shoots 7 to 10 rounds from a .40 caliber gun.

On June 2, 2009, Aja Johnson was sitting in a parked car with her cousin, Jennifer, and Tony Cage. A Black man wearing a gray hooded sweatshirt ran up to the car and shot into it, wounding Jennifer and killing Cage. The shooter was about 5 feet 9 inches tall.

## II. Procedural background.

On September 24, 2010, after a first jury deadlocked, the trial court declared a mistrial.

On March 18, 2011, a second jury found Zamora-Smith guilty of count 1, the first degree murder of Bing (Pen. Code, § 187, subd. (a)),[4] and of counts 2 and 3, the willful, deliberate and premeditated attempted murders of Gonzalez and Warner (§§ 187, subd.

---

[4] All further undesignated statutory references are to the Penal Code.

(a), 664).  As to all counts, the jury found true gun-use (§ 12022.53, subds. (b), (c), (d) & (e)(1)) and gang (§ 186.22, subd. (b)(1)) allegations.

On June 23, 2011, the trial court found that Randolph had a prior juvenile conviction within the meaning of the Three Strikes law.  The court thereafter denied Randolph's *Romero*[5] motion.  Based on Randolph's prior conviction, the court, on June 29, 2011, sentenced him on count 1 to 25 years to life doubled to 50 years to life, plus a consecutive 25 years to life for the gun-use enhancement.  On counts 2 and 3, the trial court sentenced him to two consecutive life terms, each with a minimum term of 14 years, plus two 25 years to life terms for the gun-use enhancements.

The trial court sentenced Zamora-Smith, on count 1, to 25 years to life plus a consecutive 25 years to life for the gun-use enhancement and, on counts 2 and 3, to two consecutive life terms plus two 25 years to life terms for the gun-use enhancements.

## DISCUSSION [6]

### I.     Sufficiency of the evidence.

Zamora-Smith and Randolph contend there is insufficient evidence to support the judgment.  We disagree.

In assessing the sufficiency of the evidence to support a conviction, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt.  [Citation.]  The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.]  'Conflicts and even testimony [that] is

---

[5]      *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

[6]      Zamora-Smith and Randolph have joined in the others' arguments to the extent applicable.

subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; see also *Jackson v. Virginia* (1979) 443 U.S. 307.) Unless the testimony is physically impossible or inherently improbable, a single witness's testimony is sufficient to support a conviction. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508.)

In arguing that the evidence was insufficient to establish their identity as the perpetrators of these crimes, defendants here point to, among other things, Warner's inability to identify them at the field show-up and at trial; the failure of any witness to note that the front headlight of Zamora-Smith's car was inoperable; the absence of physical evidence such as guns, DNA, fingerprints or gunshot residue linking defendants to the crime; the ubiquitous nature of gray hooded sweatshirts; and that only two people were in the car when Warner testified that three people were in the car.

Other evidence, however, established that Zamora-Smith and Randolph were involved in these crimes. All three witnesses (Warner, Gonzalez, and the 911 caller) said that the car involved was a burgundy Dodge Magnum. Two of those witnesses, Warner and Gonzalez, gave the additional detail that the car had chrome wheels. Consistent with these eyewitness accounts, Zamora-Smith and Randolph were in a burgundy Dodge Magnum with chrome wheels. Officer Burdine, who was in the helicopter, spotted Zamora-Smith and Randolph in the car within minutes of receiving a call that a shooting occurred. He did not notice any other burgundy or maroon Dodge Magnums in the area. Although Warner could not identify Randolph and Zamora-Smith at the field show-up, Warner did identify the car.

8

Both Warner and Gonzalez also said the shooter wore a gray hooded sweatshirt. A gray hooded sweatshirt was in the trunk of Zamora-Smith's car. When an officer asked Randolph if he wanted to put it on, Randolph said he didn't want it, it wasn't his. While seated in the backseat of a police car, Randolph admonished Zamora-Smith, "That's not my jacket. Don't tell them it[']s mine. Just don't tell them it[']s mine. Ain't nothing bro, ain't nothing on that jacket[,] don't tell them." Randolph's vigorous attempts to distance himself from that gray sweatshirt suggests he had something to hide with respect to it.

Warner and Gonzalez agreed that the shooter emerged from the backseat of the car. Officer Davis testified that Randolph was in the back seat of the car, even though the front passenger seat was unoccupied.[7] His presence in the backseat, coupled with the absence of a person in the front seat, tended to buttress both Warner's testimony that the shooter emerged from the back seat and the gang expert's testimony that it is common for a participant in such a crime to leave the car with the guns. In other words, the front passenger left the car after the shooting with the guns, leaving Zamora-Smith (the driver) and Randolph in the backseat.

Zamora-Smith and Randolph were in the area of the shooting very close to the time it occurred. Cell phone records established that a call was made at 11:06 p.m. to or from a cell phone found in the car. The phone was within .3 miles of the shooting at that time.

Zamora-Smith and Randolph also had a motive for the crimes. They were Rollin 40's Crip gang members. At least two of the victims, Warner and Bing, were members of a rival gang, the Black P-Stones. August and Stevely, where the shooting took place, is in Black P-Stone territory. According to the People's gang expert, committing a crime in a rival gang's territory is a way to earn respect for the gang.

---

**7**     Officer Pak testified, to the contrary, that Randolph was in the front passenger seat.

9

We conclude that this evidence is sufficient to support the judgment.

## II.     Reversal of the true finding on the gang enhancement is unwarranted.

Defendants raise two issues concerning the gang-enhancement allegation:  (A) The trial court misinstructed the jury; and (B) There is insufficient evidence to support the true finding.  We reject both contentions.

A. *The gang-enhancement instruction.*

The jury was instructed with CALCRIM No. 1401 that to prove the gang allegation, the People had to establish "[1.] the defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang; and [2.] that the defendant intended to assist, further, or promote criminal conduct by gang members." Defendants contend that the trial court should have given an amplifying or clarifying instruction on the meaning of "in association with a criminal street gang."

They rely on *People v. Albillar* (2010) 51 Cal.4th 47 (*Albillar*), which, they assert held that "in association with a criminal street gang" has a technical meaning specific to law, and therefore the trial court had a sua sponte duty to instruct on it.  That was not a holding of *Albillar*.  *Albillar* considered, among other things, whether there was sufficient evidence to support a gang enhancement.  Although not every crime committed by gang members is related to the crime, the sex offenses at issue were gang related in two ways: they were committed in association with a gang and for the benefit of the gang.  To explain how the crimes were committed "in association with a criminal street gang" the majority said that the three defendants "relied on their common gang membership and the apparatus of the gang" to commit the sex offenses.  (*Id.* at p. 60.)  The court then described how the defendants assisted each other to rape the victim.

In her partially dissenting opinion, Justice Werdegar criticized the majority's "definition" of "in association with" as a misplaced focus on gang members who associate with one another, rather than associating with the gang.  (*Albillar, supra,* 51 Cal.4th at p. 73 (conc. & dis. opn. of Werdegar, J.).)  But Justice Werdegar did not advocate a specific definition of "in association with."  Neither she nor the majority

10

stated that the term was a "technical legal term" requiring either a sua sponte special instruction or modification to CALCRIM No. 1401. Nothing in the opinion suggests that trial courts must sua sponte instruct that acting "in association with a criminal street gang" requires a reliance "on their common gang membership and the apparatus of the gang" to commit the crime. (*Albillar*, at p. 60.)

In any event, defendants have failed to show that a jury would have difficulty understanding the statutory language, "committed" "in association with any criminal street gang," without guidance. (*People v. Poggi* (1988) 45 Cal.3d 306, 327.) In fact, Justice Werdegar's dissent, relied on by defendants, cites to a common definition of "associate," namely, the definition from the "Merriam-Webster's Eleventh Collegiate Dictionary (2004)." (*Albillar, supra*, 51 Cal.4th. at p. 70, fn. 2 (conc. & dis. opn. of Werdegar, J.).) " 'When a word or phrase " 'is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request.' " [Citations.]' [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 670.) Defendants, however, failed to request a clarifying instruction, and therefore they forfeited the issue on appeal. (*People v. Russell* (2010) 50 Cal.4th 1228, 1273; *Jennings*, at p. 671.)

B.    *Sufficiency of the evidence to support the true finding.*

Defendants next contend there was insufficient evidence to support the true finding on the gang allegation. We disagree.

Section 186.22, subdivision (b)(1), provides for a sentence enhancement when the defendant is convicted of enumerated felonies "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (See also *Albillar, supra,* 51 Cal.4th at p. 59; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1047; *People v. Gardeley* (1996) 14 Cal.4th 605, 617.) The substantial evidence test we articulated above applies to our determination whether there is sufficient evidence to support a jury's true findings on the gang enhancement. (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 321-322.) We add, it "is well settled that expert testimony about

11

gang culture and habits is the type of evidence a jury may rely on to reach a verdict on a gang-related offense or a finding on a gang allegation." (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 930; see also *People v. Romero* (2006) 140 Cal.App.4th 15, 18-19.)

Defendants here argue that the evidence is insufficient to show, first, that the crimes were committed to benefit the gang, and, second, that the crimes were committed in association with a criminal street gang. The record, however, supports both elements.

First, expert testimony that particular criminal conduct benefitted a gang by enhancing its reputation can be sufficient to raise an inference the crime was committed to benefit the gang. (*Albillar, supra,* 51 Cal.4th at p. 63.) Officer Courtney, the People's gang expert, testified that gang members earn respect within the gang by committing crimes. The gang as a whole benefits because the crime bolsters its status. Going into the heart of a rival's territory and killing a rival gang member is the "ultimate gang activity" that makes the killer's status within his or her gang go "through the roof."

The evidence and expert testimony here contrasts with the evidence and expert testimony in *People v. Ramon* (2009) 175 Cal.App.4th 843, relied on by defendants. In *Ramon*, the defendants, members of the same gang, stole a truck. An unregistered gun was in the truck. A gang expert testified that the crime benefitted the gang because the defendants could commit other crimes with the stolen truck and unregistered gun. (*Id.* at pp. 847-848.) The expert's opinion the crime was committed to benefit the defendants' gang was improper because there were no facts from which he could discern whether the men acted on their own behalf or on the gang's. (*Id.* at p. 851.)

In contrast to the crimes in *Ramon*, the crimes here— a drive-by shooting of rival gang members—is a classic example of a crime committed to benefit the gang. (See *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1208-1209 [gang expert's testimony that shooter would ask someone where they are from and then shoot them for gang purposes was admissible].) At least two of the victims, Bing and Warner, were Black P-Stones, a Blood gang. They were walking, late at night, in Black P-Stone territory. Zamora-Smith and Randolph were Rollin 40's Crips, a rival of the Black P-Stones. Although defendants were Rollin 40's Crips, someone in their car asked the victims, " 'What's up, Blood,' "

perhaps, thought Warner, to lull him into a false sense of security. The rear passenger then fired his gun, killing Bing and wounding Gonzalez. As the gang expert testified, killing a gang rival in the heart of that rival's territory is the "ultimate gang activity" that benefits the gang and its members by bolstering its reputation and spreading fear. There is, therefore, no comparison between the insufficient evidence in *Ramon* and the overwhelming evidence here showing that these crimes benefitted the Rollin 40's Crips gang.

Second, the record supports the finding that defendants acted "in association with a criminal street gang" to commit the crimes. This element was established, in *Albillar*, where there was evidence the defendants relied on their common gang membership and the apparatus of the gang by, for example, helping each other to rape the victim and using the victim's fear of the gang to ensure her silence. (*Albillar*, s*upra*, 51 Cal.4th at pp. 60-62.) Similarly, the gang expert here testified it is common for gang members to accompany each other to a drive-by shooting. At least one person must use the weapon and another person may act as a lookout. Another reason gang members commit crimes with each other is so one of them can conceal the weapon. It is "common" for one participant on a shooting mission to leave the car with the weapons and hide them in a safe house.

There was evidence from which a reasonable inference could be made that this is what happened here. According to Warner, there were three people in the car that pulled alongside him, Bing, and Gonzalez that night. The front passenger asked, " 'What's up, Blood,' " and he threw a Black P-Stone gang sign. The rear passenger got out of the car and asked, "What's up homies," before shooting. The car drove away. When officers stopped the car, only two people were in it, and no guns were found. The gang expert's testimony therefore explained how the defendants used the apparatus of the gang and its resources to commit the crime. To commit the crime, they needed a driver, at least one shooter, and a person to conceal the weapons. One of the participants may have fled to a gang safe house to hide the guns, leaving the driver (Zamora-Smith) and Randolph, the rear passenger. This was substantial evidence that Zamora-Smith and Randolph came

13

together as Rollin 40's gang members to kill or try to kill rival gang members, using the sanctity of the gang and common membership to do it.

## III. The victim's statement describing the suspects was admissible as a spontaneous statement.

Defendants contend that the trial court abused its discretion by admitting, under the spontaneous statement exception to the hearsay rule, Gonzalez's description of the shooter. We disagree.

### A. *Additional facts.*

While waiting for paramedics to arrive, Gonzalez, who had been shot in the chest, made a statement describing the suspects. Counsel objected to Gonzalez's statement on the ground it was hearsay without exception. At an Evidence Code section 402 hearing, Officer Peters testified that he and his partner, Officer Morales, responded to the call of a shooting and found Gonzalez in front of an apartment building. Gonzalez was alert and conscious but suffering from a single gunshot wound to the chest. After speaking to Gonzalez for less than a minute, Officer Morales left and Peters stayed with Gonzalez. Although Gonzalez was "in shock" he was coherent and responsive to questions. In response to Peters's question about the suspect's car, Gonzalez said the shooter wore a gray sweatshirt and was seated in the backseat of the car. The front passenger had cornrows or braids. Both men were Black.

Based on the "totality of the evidence," the trial court found that the conversation between Officer Peters and Gonzalez was spontaneous and therefore admissible.

### B. *The trial court did not abuse its discretion by admitting the evidence as a spontaneous statement.*

Evidence Code section 1240 provides an exception to the hearsay rule for spontaneous declarations, that is, statements purporting to describe or explain an act, condition, or event perceived by the declarant, made spontaneously while the declarant was under the stress of excitement caused by such perception. (*People v. Lynch* (2010) 50 Cal.4th 693, 751; *People v. Saracoglu* (2007) 152 Cal.App.4th 1584, 1588.) "Spontaneous statements are deemed sufficiently trustworthy to be admitted into

evidence because ' " 'in the stress of nervous excitement the reflective faculties may be stilled and the utterance may become the unreflecting and sincere expression of one's actual impressions and belief.' " [Citation.]' [Citation.]" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 810; see also *Lynch*, at p. 751; *Saracoglu*, at p. 1588.)  For a statement to qualify as a spontaneous declaration, " '(1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been [made] before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' [Citations.]" (*People v. Poggi, supra,* 45 Cal.3d at p. 318; see also *Gutierrez,* at pp. 809-810; *Lynch*, at pp. 751-752.)

Whether a statement is spontaneous is a question of fact within the trial court's discretion, and " 'each fact pattern must be considered on its own merits . . . .' " (*People v. Riva* (2003) 112 Cal.App.4th 981, 995; see also *People v. Poggi*, *supra*, 45 Cal.3d at p. 318.)  The crucial element in the determination is the speaker's mental state. (*People v. Gutierrez, supra,* 45 Cal.4th at p. 811.)  We review the trial court's ruling for abuse of discretion. (*Poggi*, at p. 318.)

Whether statements were made in response to questioning and whether the declarant was calmed are important factors to consider on the issue of spontaneity.  But " '[n]either lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity *if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance*.' [Citation]." (*People v. Poggi, supra,* 45 Cal.3d at p. 319; see also *People v. Gutierrez, supra,* 45 Cal.4th at p. 810 [the amount of time between a startling event and the declaration is not dispositive, but it must be scrutinized]; *People v. Riva, supra,* 112 Cal.App.4th at p. 995 ["The requirement is for a spontaneous declaration, not an instantaneous one"].)

15

In *Poggi*, for example, when the officer arrived at the victim's home, she was bleeding from stab wounds from which she would later die. (*People v. Poggi, supra*, 45 Cal.3d at p. 316.) Afraid that her attacker was still in the house, the victim was initially incoherent and had to be told several times to be calm and to slow down while the officer questioned her over the course of about 15 to 20 minutes. (*Ibid.*) *Poggi* found that the victim's statements were admissible, even though they were delivered about 30 minutes after the attack, in response to questioning, and after the officer calmed her down sufficiently to be coherent. (*Id.* at p. 319.)

Here, Officers Morales and Peters encountered the victim, Gonzalez, at the apartment building to which he had fled. Gonzalez was bleeding from a gunshot wound to the chest. He was in shock but nonetheless coherent and responsive; his voice was not "calm," but he wasn't screaming. From this evidence, Gonzalez was not in as extreme a state as the victim in *Poggi*. This does not, however, mean he was calm and reflective. He had just been shot, he was bleeding from his wound, and he was waiting for paramedics. Being shot is undoubtedly an occurrence startling enough to produce the nervous excitement sufficient to render an utterance spontaneous and unreflecting. (*People v. Riva, supra,* 112 Cal.App.4th at p. 996; *People v. Farmer* (1989) 47 Cal.3d 888, 904 [pain from gunshot wounds and doubt about survival no doubt preoccupied the declarant, giving him little opportunity to spin a false tale], overruled on another ground by *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.)

Also, not much time passed between the shooting and Gonzalez's statement. The officers responded to the shooting around 11:20 to 11:30 p.m. Officer Morales and Peters were the first officers to respond to Gonzalez, and Officer Morales spoke to Gonzalez for less than a minute before Officer Peters spoke to him.

Nor were Officer Peters's questions suggestive, so as to deprive the statements of spontaneity or to cause Gonzalez to reflect. (See, e.g., *People v. Poggi, supra,* 45 Cal.3d at p. 320.) The usual questions an officer asks a crime victim on initial contact (e.g., What happened? When and where did it happen?) are routine, nonsuggestive inquiries that do not bar application of the spontaneous utterance exception to the hearsay rule.

16

(*People v. Saracoglu, supra,* 152 Cal.App.4th at p. 1590; see also *People v. Farmer, supra,* 47 Cal.3d at p. 904 ["The fact that a statement is made in response to questioning is one factor suggesting the answer may be the product of deliberation, but it does not ipso facto deprive the statement of spontaneity"].) An answer to a simple inquiry may be spontaneous. (*Farmer*, at p. 904.)

Officer Peters made a routine inquiry about the suspect's car. Therefore, nothing in the officer's question about the car suggested an answer about what the shooter looked like or wore. Although Gonzalez responded with a description of the shooter, his failure to respond to the question directly asked supports a finding that Gonzalez's description was spontaneous and made without reflection.

Defendants take a contrary view of Gonzalez's response. They suggest that Gonzalez did not answer the question asked about the suspect's car because he had already provided that information and he deliberately described the shooter instead. We see no abuse of discretion by taking the opposite view, that Gonzalez was so excited he blurted out a description of the shooter rather than a description of the car.

We therefore conclude that the trial court did not abuse its discretion by admitting Gonzalez's description of the suspects as a spontaneous statement.

## IV. No error resulted from the denial of defendant's *Faretta*[8] motions.

The trial court denied as untimely Zamora-Smith's and Randolph's *Faretta* motions, made at the outset of the sentencing hearing. No abuse of discretion occurred.

### A. *Additional facts.*

On June 29, 2011, at the sentencing hearing, both defendants made *Faretta* motions. Zamora-Smith asked to represent himself to "do some investigation." But he was not ready to proceed with the sentencing hearing or to argue his new trial motion. When asked why he had not made the motion sooner, Zamora-Smith said he didn't have contact with his lawyer. The court, however, said it saw defense counsel go to lockup to speak to his client and commented that counsel had done an "exemplary" job. The court

---

[8]     *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

17

found that Zamora-Smith's reasons for the motion were a "sham, to say the least, and it appears defendant is just trying to delay the inevitable." After going through the factors in *People v. Windham* (1977) 19 Cal.3d 121, the court denied the motion.

Because he didn't "know my case as well as I think I should," Randolph also asked to represent himself. After Randolph said he didn't know how much time he would need, the trial court denied his motion for the same reasons, including it was untimely.

B.      *Defendants' requests to represent themselves were subject to the trial court's discretion.*

A criminal defendant has a constitutional right to counsel at all critical stages of a criminal prosecution, including sentencing. (*People v. Doolin* (2009) 45 Cal.4th 390, 453 (*Doolin*).) A criminal defendant may waive the right to counsel and instead elect self-representation. (*Faretta, supra*, 422 U.S. at pp. 807, 834-835; *Doolin*, at p. 453.) "The right of self-representation is absolute, but only if a request to do so is knowingly and voluntarily made and if asserted a reasonable time before trial begins. Otherwise, requests for self-representation are addressed to the trial court's sound discretion." (*Doolin*, at p. 453; see also *People v. Lynch, supra,* 50 Cal.4th at pp. 721-723; *People v. Windham, supra,* 19 Cal.3d at pp. 124, 128-129.) Factors a court should consider in exercising its discretion when a *Faretta* motion is made after trial commences are the reasons for the request, the quality of the counsel representing the party, the party's prior proclivity to substitute counsel, the length and stage of the proceedings, and the disruption or delay reasonably resulting from the grant of the motion. (*Windham*, at pp. 127-128.) Rulings on untimely requests are reviewed for abuse of discretion. (*Doolin*, at p. 453.)

Here, defendants' made their requests to represent themselves after trial commenced, at their sentencing hearing. At least one Court of Appeal has held that because sentencing is a "proceeding separate and distinct from the trial" the defendant's *Faretta* motion, made after the jury's verdict but two months before the sentencing hearing, was timely. (*People v. Miller* (2007) 153 Cal.App.4th 1015, 1023-1024.)

18

Because the request was timely, *Miller* held that the defendant had an absolute right to represent himself at the sentencing hearing. (*Id.* at p. 1024.)

In contrast to *Miller*, defendants' *Faretta* motions were not made well in advance of the sentencing hearing. They were made on the day of the hearing, at its outset. Such a motion, made on the day of sentencing, is untimely. (*Doolin, supra,* 45 Cal.4th at pp. 452-455.) *Doolin* found that the capital defendant's *Faretta* motion, made on the day scheduled for sentencing, was untimely; hence, it was subject to the trial court's discretion. (*Id.* at pp. 452-455, 455, fn. 39.)[9]

Under *Doolin,* the trial court's determination of the *Faretta* motions was subject to its discretion. The trial court here carefully considered the *Windham* factors. First, neither Zamora-Smith nor Randolph articulated legitimate reasons for their requests to represent themselves. Zamora-Smith vaguely said he needed to "do some investigation," and Randolph simply felt he didn't know his case as well as he thought he should. Defendants also could not explain the lateness of the requests. Zamora-Smith had been in custody for 911 days and yet had waited to make the request for self-representation. The trial court flatly disputed Zamora-Smith's suggestion he couldn't have made the request sooner because of lack of contact with his counsel. The court had seen counsel go to lockup and "talk to you . . . all [the] time. He talks to you regularly."

Second, the trial court found no fault with defense counsel, calling Zamora-Smith's counsel's work "exemplary."

Third, defendants had not made any prior *Marsden* or *Faretta* motions.

Fourth, the case had been ongoing for years, yet defendants waited until the last proceeding—the sentencing hearing—to ask to represent themselves.

---

[9] In finding that defendant's *Faretta* rights were not violated, *Doolin* also noted that the defendant never requested self-representation during the guilt or penalty phases. He only requested self-representation after his request to substitute his appointed counsel was denied.

*Doolin* also distinguished *Miller*, finding that the "circumstances of defendant's posttrial request for self-representation are in stark contrast" to the circumstances in *Miller.* (*Doolin, supra,* 45 Cal.4th at p. 455, fn. 39.)

19

Finally, granting the motions would have disrupted the proceedings because defendants were not prepared to proceed with the sentencing hearing.

Balancing these factors, the trial court found that the requests to represent themselves were a "sham." There was no abuse of discretion in that finding. The trial court could certainly believe that defendants were merely trying to delay the orderly processes of justice. (*People v. Miller, supra,* 153 Cal.App.4th at p. 1021.)

## V. The trial court did not abuse its discretion by denying the petition to disclose juror information.

Based on an allegation that undue pressure was placed on jurors to deliver a verdict, defendant petitioned for release of juror information, which the trial court denied. The trial court did not abuse its discretion.

### A. *Additional facts.*

Jury deliberations began on Thursday, March 17, 2011, at 9:40 a.m. The next day, Friday, March 18, the jury sent this note at 3:32 p.m.:

"*We would like to speak with your honor regarding our ability to reach a verdict.* [¶] In terms of the firearms charge for [Zamora-]Smith does a 'Principal' include an aider and abettor?" (Italics added.)

The trial court answered "yes" to the question regarding the firearms charge. According to the declaration of Zamora-Smith's trial counsel submitted in support of a petition for disclosure of juror information, the trial court had the bailiff tell jurors they would return on Monday to continue deliberations. The bailiff then told the court that the foreperson, Juror No. 2 or 8, could not come back on Monday due to a flight out of town, which the juror had not mentioned during voir dire. The bailiff told the jurors they had to come back on Monday. Less than a minute later, the jury rendered its guilty verdict. The clerk's transcript shows that the jury informed the court it had reached a verdict at 3:50 p.m., 18 minutes after sending the note.

After the verdict was rendered, defense counsel spoke to several jurors, "many" of whom were "visibly upset and emotional." One juror hoped that the case would be

20

reversed on appeal and said he was uncomfortable with how the deliberations were rushed at the end. He felt pressured into rendering a verdict.

Zamora-Smith, joined by Randolph, then petitioned the court for disclosure of juror information. Defense counsel argued that the sequence of events suggested that undue pressure was exerted on holdout jurors. A couple of jurors said that when the note was sent out, the "spread" was seven-to-five in favor of guilt. Counsel therefore asked for an opportunity to explore whether there was undue pressure placed on jurors by the foreperson.

The trial court noted that the jurors did not hesitate during polling and that what counsel was seeking fell within the protections of Evidence Code section 1150, subdivision (a), concerning the mental processes of the jurors. Finding no indicia of misconduct, the trial court found there was no good cause to release the information.

B. *Defendants failed to show good cause for the release of jurors' identifying information.*

Following a jury's verdict, a defendant may petition the court for access to personal juror identifying information for the purpose of making a motion for new trial or any other lawful purpose. (Code of Civ. Proc., § 206, subd. (g).) "[R]equests for personal juror identifying information [shall be considered under] Section 237." Code of Civil Procedure section 237, subdivision (b), provides that a "petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information. The court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information, but shall not set the matter for hearing if there is a showing on the record of facts that establish a compelling interest against disclosure. A compelling interest includes, but is not limited to, protecting jurors from threats or danger of physical harm. If the court does not set the matter for hearing, the court shall by minute order set forth the reasons and make express findings either of a

21

lack of a prima facie showing of good cause or the presence of a compelling interest against disclosure."[10]

To demonstrate good cause, a defendant must make a sufficient showing "to support a reasonable belief that jury misconduct occurred." (*People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1319.) Good cause does not exist where the allegations of jury misconduct are speculative or an attempt to go on a fishing expedition. (*People v. Wilson* (1996) 43 Cal.App.4th 839, 852; *People v. Hedgecock* (1990) 51 Cal.3d 395, 419.) A trial court's denial of a petition to disclose juror identification information is reviewed for abuse of discretion. (*Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1097.)

Any "otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly." (Evid. Code, § 1150, subd. (a).) But no "evidence is admissible to show the *effect* of such statement, conduct,

---

[10]    Code of Civil Procedure, section 237, also provides: "(c) If a hearing is set pursuant to subdivision (b), the petitioner shall provide notice of the petition and the time and place of the hearing at least 20 days prior to the date of the hearing to the parties in the criminal action. The court shall provide notice to each affected former juror by personal service or by first-class mail, addressed to the last known address of the former juror as shown in the records of the court. In a capital case, the petitioner shall also serve notice on the Attorney General. Any affected former juror may appear in person, in writing, by telephone, or by counsel to protest the granting of the petition. A former juror who wishes to appear at the hearing to oppose the unsealing of the personal juror identifying information may request the court to close the hearing in order to protect the former juror's anonymity.

"(d) After the hearing, the records shall be made available as requested in the petition, unless a former juror's protest to the granting of the petition is sustained. The court shall sustain the protest of the former juror if, in the discretion of the court, the petitioner fails to show good cause, the record establishes the presence of a compelling interest against disclosure as defined in subdivision (b), or the juror is unwilling to be contacted by the petitioner. The court shall set forth reasons and make express findings to support the granting or denying of the petition to disclose. The court may require the person to whom disclosure is made, or his or her agent or employee, to agree not to divulge jurors' identities or identifying information to others; the court may otherwise limit disclosure in any manner it deems appropriate."

condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (*Ibid.*, italics added; *In re Stankewitz* (1985) 40 Cal.3d 391, 397.) "Thus, jurors may testify to 'overt acts'—that is, such statements, conduct, conditions, or events as are 'open to sight, hearing, and the other senses and thus subject to corroboration'—but may not testify to 'the subjective reasoning processes of the individual juror . . . .' [Citation.]" (*In re Stankewitz,* at p. 398; see also *People v. Perez* (1992) 4 Cal.App.4th 893, 906-907.)

In *Stankewitz*, for example, a declaration regarding a juror's incorrect legal advice to fellow jurors during deliberations was admissible to show misconduct. In *Perez,* a juror told defense counsel that the jury found defendant guilty because he did not testify. (*People v. Perez, supra,* 4 Cal.App.4th at p. 905.) An inquiry into these matters would not violate Evidence Code section 1150, subdivision (a), because it would not require investigation into the subjective reasoning processes of the individual jurors. (*People v. Hedgecock, supra,* 51 Cal.3d at pp. 418-419.) Especially where the "very making of the statement" would constitute misconduct, statements are among the overt acts admissible to show a verdict was improperly influenced. (*In re Stankewitz, supra,* 40 Cal.3d at p. 398.) Thus, evidence of a jury's explicit or implicit agreement to violate a court's instruction does not touch on jurors' subjective reasoning processes. (*Perez*, at p. 908.)

This case is not like *Stankewitz* or *Perez*. Defendants here did not make a sufficient showing of good cause for release of juror information. Defense counsel's declaration established merely that some jurors were upset and emotional in the jury assembly room. Nothing in the declaration indicated that any of these jurors tied their emotional state to misconduct in the jury room as opposed, for example, to the emotions one might reasonably expect jurors to exhibit after a difficult trial involving one count of murder and two counts of attempted murder.

One juror did hope that the case would be overturned on appeal and was uncomfortable with how "deliberations [were] rushed at the end." This juror said he felt pressured into rendering a verdict. This does not support a reasonable belief that some statement or overt act that itself would constitute misconduct and would be admissible

23

under Evidence Code section 1150 occurred in the 18 minutes between the time the jury sent the note at 3:32 p.m. and the time it informed the court at 3:50 p.m. a verdict had been reached. Even if, hypothetically, the jury foreperson exhorted his fellow jurors to hurry up and reach a verdict, this would not constitute misconduct. The petition therefore amounted to a fishing expedition that risks running afoul of Evidence Code section 1150 by probing jurors' mental processes.

## VI. The trial court's response to the jury's note did not result in a coerced verdict.

Based on the same facts concerning the jury's note, defendants contend that the trial court's response to the note coerced a verdict. It did not.

A claim that a jury was pressured into rendering a verdict depends on the particular circumstances of the case. (*People v. Pride* (1992) 3 Cal.4th 195, 265; *People v. Breaux* (1991) 1 Cal.4th 281, 319.) A trial court may, for example, ask deadlocked jurors to continue deliberating when, in the exercise of its discretion, it finds there is a reasonable probability that the jury will be able to agree on a verdict. (*Pride*, at p. 265.)

It is not clear that the jury here was even deadlocked. The jury's note merely said they wanted to talk to the judge "regarding our ability to reach a verdict." The note did not state the jurors were deadlocked or could not reach a verdict. All the trial court did was inform the jurors that they would have to come back on Monday to deliberate. There was nothing coercive about telling a jury that is still deliberating at 3:32 p.m. on Friday it will have to return on Monday.

Nor do we agree that what occurred was tantamount to an *Allen* charge that violated defendants' due process rights. In *Allen v. United States* (1896) 164 U.S. 492, 501, the trial court instructed the jury that if a majority were for conviction, a dissenting juror should consider whether his or her doubt was reasonable; conversely, a dissenting juror should consider the same when the majority was for acquittal. *Allen* found no error. Error can occur, however, if a deadlocked jury is told, " 'You have got to reach a decision in this case.' " (*Jenkins v. United States* (1965) 380 U.S. 445, 446.) Such an order is coercive.

24

Nothing the trial court here did resembled the instructions in either *Allen* or *Jenkins.* The court merely told the jury, which had not clearly said it was deadlocked, it would continue deliberations on Monday. The advisement was appropriate and not coercive.

## VII. The trial court did not abuse its discretion by denying Randolph's *Romero* motion.

At sentencing, the trial court denied Randolph's oral *Romero* motion, because he had a juvenile petition sustained in 2005 and he was on felony probation at the time of this case. Randolph contends the trial court abused its discretion by denying his *Romero* motion. We disagree.

In the furtherance of justice, a trial court may strike or dismiss a prior conviction allegation. (§ 1385; *People v. Superior Court (Romero), supra*, 13 Cal.4th at p. 504.) A trial court's refusal to strike a prior conviction allegation is reviewed under the deferential abuse of discretion standard. (*People v. Carmony* (2004) 33 Cal.4th 367, 375.) The party seeking reversal must therefore " 'clearly show that the sentencing decision was irrational or arbitrary. [Citation.]' " (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977.) It is not enough to show that reasonable people might disagree about whether to strike a prior conviction. (*Carmony*, at p. 378.) Only extraordinary circumstances justify a finding that a career criminal is outside the Three Strikes law. (*Ibid.*) Therefore, "the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary." (*Ibid.*)

When considering whether to strike prior convictions, the relevant factors a court must consider are "whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.) The Three Strikes law "not only establishes a sentencing

25

norm, it carefully circumscribes the trial court's power to depart from this norm . . . . [T]he law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper." (*People v. Carmony, supra*, 33 Cal.4th at p. 378.)

Randolph contends he falls outside the spirit of the Three Strikes law based on his limited criminal history, absence of a history of drug use, and the relative degree of stability in his life (e.g., his mother and other family members attended trial, he had at one point in time been enrolled in GED program, and he might have had a child in 2008). Although the trial court could certainly have considered these factors, the court considered Randolph's criminal history to preclude striking the juvenile adjudication. That prior adjudication was for a robbery in which Randolph's companion was armed with a gun. In addition to that robbery, he had two other juvenile petitions sustained, both for battery (one in 2004 and the other in 2005). In 2008, when he was an adult, he was convicted of carrying a concealed firearm (former § 12025, subd. (a)(1)).

Considering these relevant factors and the deferential standard of review, we cannot say that the trial court abused its discretion by refusing to strike Randolph's prior juvenile adjudication.

## VIII. Randolph's constitutional rights were not violated by the use of his prior juvenile adjudication as a strike.

The trial court used Randolph's prior juvenile adjudication to double his sentence under the Three Strikes law. Although he acknowledges that *People v. Nguyen* (2009) 46 Cal.4th 1007, found that using a prior juvenile adjudication as a "strike" to double a sentence does not violate a criminal defendant's federal due process and constitutional rights, Randolph raises the issue to preserve his right to federal review.

*Apprendi v. New Jersey* (2000) 530 U.S. 466 held that any fact, other than the fact of a prior conviction, that increases the penalty for a crime beyond the prescribed statutory maximum must be tried to a jury and proved beyond a reasonable doubt. *Nguyen*, however, rejected the contention that the absence of a right to a jury trial at a juvenile adjudication precludes all future use of a sustained petition as a strike. "So long

26

as an accused adult is accorded his or her right to a jury trial *in the adult proceeding* as to all facts that influence the maximum permissible sentence, no reason appears why a constitutionally reliable prior adjudication of criminality, obtained pursuant to *all procedural guarantees constitutionally due to the offender in the prior proceeding*— specifically including the right to proof beyond a reasonable doubt—should not also be among the facts available for that sentencing purpose." (*People v. Nguyen, supra,* 46 Cal.4th at p. 1023.) Randolph had the right to a jury trial to determine whether he suffered the prior juvenile adjudication, and therefore there was no *Apprendi* violation. (*Ibid.*)

We are bound to follow *Nguyen.* (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

## IX. Instructional error.

Defendants contend that the trial court prejudicially erred by instructing the jury with CALCRIM Nos. 223,[11] direct and circumstantial evidence, and 224,[12] circumstantial

---

[11] "Facts may be proved by direct or circumstantial evidence or by a combination of both. *Direct evidence* can prove a fact by itself. For example, if a witness testifies he saw it raining outside before he came into the courthouse, that testimony is direct evidence that it was raining. *Circumstantial evidence* also may be called indirect evidence. Circumstantial evidence does not directly prove the fact to be decided, but is evidence of another fact or group of facts from which you may logically and reasonably conclude the truth of the fact in question. For example, if a witness testifies that he saw someone come inside wearing a raincoat covered with drops of water, that testimony is circumstantial evidence because it may support a conclusion that it was raining outside. [¶] Both direct and circumstantial evidence are acceptable types of evidence to prove or disprove the elements of a charge, including intent and mental state and acts necessary to a conviction, and neither is necessarily more reliable than the other. Neither is entitled to any greater weight than the other. You must decide whether a fact in issue has been proved based on all the evidence." (CALCRIM No. 223.)

[12] "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from

27

evidence.[13] No error occurred.

On review, we "examine the jury instructions as a whole, in light of the trial record, to determine whether it is reasonably likely the jury understood the challenged instruction in [such] a way that undermined the presumption of innocence or tended to relieve the prosecution of the burden to prove defendant's guilt beyond a reasonable doubt. [Citation.]" (*People v. Paysinger* (2009) 174 Cal.App.4th 26, 30.)

CALCRIM No. 223 instructs the jury that facts may be proved by direct or circumstantial evidence or a combination. The instruction states that both types of evidence "are acceptable types of evidence to prove or disprove the elements of a charge, including intent and mental state and acts necessary to a conviction, and neither is necessarily more reliable than the other." According to defendants, the reference to "disproving the charges" lessens the prosecutor's burden of proof by implying that the defense must disprove the charges.

We disagree. The jury was clearly instructed, via CALCRIM No. 220, that a defendant is presumed innocent and that the People must prove a defendant guilty beyond a reasonable doubt. CALCRIM No. 223 does not contradict that instruction. It does not state that the defense is required to prove or to disprove anything or otherwise mention the burden of proof. A defendant certainly may offer direct or circumstantial evidence to prove or to disprove a fact, and that is all the instruction states. "Reasonably read, the instruction cautions only that neither direct nor circumstantial evidence should be accorded greater weight simply because it is direct or circumstantial evidence." (*People v. Anderson* (2007) 152 Cal.App.4th 919, 930; accord *People v. Ibarra* (2007) 156

---

the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable." (CALCRIM No. 224.)

[13] Defendants did not object to those instructions, and therefore have arguably forfeited the issue on appeal.

Cal.App.4th 1174, 1186.) We therefore reject defendants' claim that CALCRIM No. 223 violated his due process rights.

We reject their similar claims about CALCRIM No. 224, namely, that it "couches the jury's choices in terms of whether the circumstantial evidence points" to guilty or *innocence*, as opposed to guilty or *not guilty*. Defendants rely on *People v. Han* (2000) 78 Cal.App.4th 797. *Han* appreciated the "semantic difference" between "a lack of finding of guilt" and "innocence." (*Id*. at p. 809.) The court speculated that language in CALJIC No. 2.01 referring to "innocence" would in future be "cleaned up," for "the language is inapt and potentially misleading in this respect standing alone." (*Han*, at p. 809.)

*Anderson* disagreed with *Han*. *Anderson* noted that for a defendant to be found not guilty, the evidence as a whole need not prove innocence but need only fail to prove guilt beyond a reasonable doubt. (*People v. Anderson, supra,* 152 Cal.App.4th at p. 932.) The basis of a not-guilty verdict therefore is an insufficiency of the evidence of guilt. (*Ibid.*) The issue is different, however, as to evidence, which may fall into one of three categories: (1) evidence tending to prove guilt, (2) evidence tending to prove innocence, and (3) evidence having no bearing on guilt or innocence. (*Id.* at p. 933.) Evidence in the third category is irrelevant to the case and should be excluded. "Thus, if a particular item of evidence, circumstantial or otherwise, is relevant to the jury's ultimate determination, it is relevant only because it tends to prove either guilt or innocence." (*Ibid.*; accord, *People v. Ibarra, supra,* 156 Cal.App.4th at p. 1187; see *People v. Crew* (2003) 31 Cal.4th 822, 848 [finding it not reasonably likely jury would misconstrue instructions referring to "guilt or innocence"; "The instructions in question use the word 'innocence' to mean evidence less than that required to establish guilt, not to mean the defendant must establish innocence or that the prosecution has any burden other than proof beyond a reasonable doubt"].)

We agree with these authorities rejecting defendants' interpretation of CALCRIM No. 224.

## X. The trial court did not abuse its discretion by denying Randolph's request to continue the sentencing hearing.

Randolph contends that the trial court's refusal to continue his new trial motion so that he could investigate a potential alibi witness violated his constitutional rights to counsel and to due process and was an abuse of discretion. We do not agree.

"Continuances shall be granted only upon a showing of good cause." (§ 1050, subd. (e); see also *Doolin, supra,* 45 Cal.4th at p. 450.) Whether to grant a continuance is a decision left to the trial court's discretion, although that discretion may not be exercised in a way that deprives the defendant or his attorney of a reasonable opportunity to prepare. (*People v. Sakarias* (2000) 22 Cal.4th 596, 646.) The court must consider the benefit the moving party anticipates and also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion. (*Doolin*, at p. 450.) On review, we must consider the circumstances of the case and the reasons presented for the request to determine whether the trial court's denial of the continuance was so arbitrary as to deny due process. (*Ibid.*) "Absent a showing of an abuse of discretion and prejudice, the trial court's denial does not warrant reversal." (*Ibid.*)

At the sentencing hearing here, just before the trial court was to consider the motions for a new trial, Randolph's defense counsel asked for a continuance because just that morning Randolph told him about a potential alibi witness who may have been with Randolph the night of the crimes. Counsel therefore asked for time to locate the witness and to get her statement. The trial court denied the request.

We see no abuse of discretion. First, no explanation was offered for the delay in identifying this potential alibi witness, other than that sometimes clients fail to disclose information despite numerous interviews. This matter, however, had been through two trials and, as defense counsel noted, an alibi witness had testified at the first trial. The trial court also noted that the case had been filed on June 16, 2009, that defense counsel

30

was almost immediately retained, and that the verdict was rendered on March 18, 2011. The motion for a new trial was held on June 29, 2011, and therefore defense counsel had more than adequate time to prepare the motion. Although the court agreed that sometimes clients withhold information, "This matter has been going on for some time and all of [a] sudden your client gives you a name."

Second, it is not clear any benefit would have accrued to Randolph from the continuance. (*People v. Beeler* (1995) 9 Cal.4th 953, 1003 ["An important factor for a trial court to consider is whether a continuance would be useful"].) His counsel merely said that his client had identified a potential witness who had been with him that night. He did not clarify how this witness could provide an alibi. Counsel also had a name but no address or telephone number, and therefore it was not clear he could locate this witness in a reasonable amount of time. (*Id.* at p. 1004 [evidence, even if material, must be obtained in a reasonable amount of time].)

We see neither an abuse of discretion nor a denial of due process.

31

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.


We concur:


CROSKEY, Acting P. J.


KITCHING, J.