[No. B182220. Second Dist., Div. Three. July 9, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
ATTILA PETER SARACOGLU, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION†]**

†Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for partial publication. The portions of this opinion to be deleted from publication are those portions enclosed within double brackets, [[/]].

COUNSEL

Jennifer L. Peabody, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Joseph P. Lee and Marc E. Turchin, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KLEIN, P. J.—Defendant and appellant Attila Peter Saracoglu, appeals from the judgment entered following his conviction, by jury trial, for corporal injury to a spouse, with prior serious felony conviction findings (Pen. Code, §§ 273.5, 667, subds. (a)–(i)). Sentenced to state prison for six years, he claims there was trial error.

The judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]), the evidence established the following.

Sometime between 7:00 and 7:30 p.m. on December 8, 2004, Los Angeles Police Officer David Hawkins and his partner were out on patrol when they were directed to "[c]ome to the police station for a domestic violence investigation." When the officers arrived at the North Hollywood police station about 7:30 p.m., they were met at the front desk by a woman with a child. The woman, Rachel Saracoglu (Rachel) was nervous, crying and shaking. Hawkins testified Rachel "was very upset, very scared," and "in a bad state."

Rachel told Hawkins she had been assaulted by defendant Saracoglu 30 minutes earlier at "about 7:00 o'clock." Rachel said she and Saracoglu got into an argument at home because he had left their child alone in the car when he went into a store. During the argument, Saracoglu choked Rachel from behind, pushed her and hit her. He also threatened her, saying, "You better know your place. Don't call the police or I'll put a bullet in your fucking head." Rachel said she had come to the police station because she was frightened by Saracoglu's death threat. Hawkins testified: "I don't recall the exact wording, but she was afraid. That's why she came to the police station. She thought he was going to take action."

Hawkins testified he could see the following injuries on Rachel: a cut across her nose; cuts on the inside of her lip; small red marks on her left forearm; bruising around her ribs. Rachel said Saracoglu had caused these injuries, and that he had also poked her in the eye. Hawkins photographed the injuries. He asked Rachel if she wanted an emergency protective order, and she said she did.

Thereafter, Hawkins went to the couple's residence and arrested Saracoglu, who appeared to have sustained no injuries.

Although Rachel showed up on the day set for trial to begin, she subsequently failed to honor an on-call arrangement she had made with the trial court. Even though a body attachment warrant was issued and she had assured the prosecutor she would appear, Rachel did not testify.

The only evidence at trial was Officer Hawkins's testimony about his encounter with Rachel at the police station and his subsequent arrest of Saracoglu.

## CONTENTIONS

1. The trial court erred by admitting hearsay evidence of Rachel's statement to Hawkins.

2. The prosecutor committed misconduct during closing argument.

## DISCUSSION

### 1. *Evidence of Rachel's extra-judicial statement was properly admitted*

Saracoglu contends the trial court erred by admitting hearsay evidence of Rachel's statement to Officer Hawkins because it was not an excited utterance and, even if it was, its admission violated the confrontation clause. This claim is meritless.

#### a. *Rachel's statement was a spontaneous utterance*

■ Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." "[T]he basis for the circumstantial trustworthiness of spontaneous utterances is that in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief. [¶] The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is . . . not the nature of the statement but the mental state of the speaker. The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example—may be important, but solely as an indicator of the mental state of the declarant. The fact that a statement is made in response to questioning is one factor suggesting the answer may be the product of deliberation, but it does not ipso facto deprive the statement of spontaneity." (*People v. Farmer* (1989) 47 Cal.3d 888, 903–904 [254 Cal.Rptr. 508, 765 P.2d 940], disapproved on other grounds in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6 [94 Cal.Rptr.2d 396, 996 P.2d 46].)

The decision to admit evidence under Evidence Code section 1240 is reviewed for abuse of discretion. (*People v. Phillips* (2000) 22 Cal.4th 226, 236 [92 Cal.Rptr.2d 58, 991 P.2d 145].) "Whether the requirements of the spontaneous statement exception are satisfied in any given case is, in general,

largely a question of fact. [Citation.] The determination of the question is vested in the court, not the jury. [Citation.] In performing this task, the court 'necessarily [exercises] some element of discretion . . . .' [Citation.]" (*People v. Poggi* (1988) 45 Cal.3d 306, 318 [246 Cal.Rptr. 886, 753 P.2d 1082]; see also *People v. Pirwani* (2004) 119 Cal.App.4th 770, 787 [14 Cal.Rptr.3d 673] ["We apply the abuse of discretion standard in reviewing the trial court's determination to admit or exclude hearsay evidence. That standard applies to questions about the existence of the elements necessary to satisfy the hearsay exception."].)

Saracoglu argues too much time had elapsed between the alleged exciting event and Rachel's statements to Hawkins. But no more than about 30 minutes had gone by.[1] Much longer periods of time have been found not to preclude application of the spontaneous utterance hearsay exception. (See *People v. Brown* (2003) 31 Cal.4th 518, 541 [3 Cal.Rptr.3d 145, 73 P.3d 1137] [two and one-half hours]; *People v. Raley* (1992) 2 Cal.4th 870, 893–894 [8 Cal.Rptr.2d 678, 830 P.2d 712] [18 hours]; *In re Emilye A.* (1992) 9 Cal.App.4th 1695, 1713 [12 Cal.Rptr.2d 294] [one to two days].) The mere passage of time in this case was insufficient to deprive Rachel's statement of spontaneity.

Saracoglu argues Rachel's statements were not made while still under the stress of excitement because she had an opportunity to deliberate and reflect. Saracoglu predicates this argument on his assertion there had been a significant intervening event because Rachel "waited until the incident was over, loaded her child in the car and then drove to the local police station and awaited the arrival of two on-duty police officers." But there was no evidence in the record showing Rachel drove herself to the station. Officer Hawkins testified he did not know "whether or not she arrived at the police station in a vehicle." In fact, the record does not reveal *how* Rachel got to the station. But, in any event, we would not change our conclusion just because Rachel had the wherewithal to drive herself and her child to the police station in order to make her escape. Saracoglu's reliance on *Pirwani* in this regard is misplaced. The hearsay declaration in that case did not constitute a spontaneous utterance because, during a two-day lapse between the declarant's calling the witness in a distraught state and ultimately telling the witness why she was upset, the declarant had gone to the police and made a report accusing

---

[1] At one point, Saracoglu asserts Rachel "*drove* to the police station 30 minutes *after* the alleged altercation." (Italics added.) However, the record does not show how Rachel got to the police station. In any event, any suggestion Rachel did not *begin* her journey until 30 minutes after her fight with Saracoglu is clearly incorrect because she was already at the station when Hawkins arrived at 7:30 p.m., which was only about 30 minutes after the assault allegedly occurred.

the defendant of stealing from her. (*People v. Pirwani, supra*, 119 Cal.App.4th at pp. 789–790.)

Saracoglu argues Rachel's statements lacked spontaneity because they "were made in response to questions posed by" Officer Hawkins. However, the record does not show Rachel was responding to questions.[2] But even if she was, there is no reason to suppose Hawkins's questions were anything other than the usual questions asked when an officer initially contacts a victim: What happened? When and where did this happen? What happened next? Rachel's answers to these kinds of routine, nonsuggestive inquiries would not bar application of the spontaneous utterance hearsay exception. (See *People v. Morrison* (2004) 34 Cal.4th 698, 719 [21 Cal.Rptr.3d 682, 101 P.3d 568] [shooting victim's response to officer's question "who did it" was admissible]; see also *People v. Alvarez* (1996) 14 Cal.4th 155, 186 [58 Cal.Rptr.2d 385, 926 P.2d 365] [replying to questions does not necessarily negate spontaneity]; *People v. Poggi, supra*, 45 Cal.3d at pp. 319–320 ["[F]act that the statements were delivered in response to questioning does not render them nonspontaneous. With one exception [the officers'] questions appear to have been simple and nonsuggestive—in substance, 'What happened?', 'What happened then?', and so on."].) The crucial issue is the declarant's mental state and the evidence shows Rachel was quite distraught; when Hawkins initially encountered her at the police station, she was crying, shaking and fearful.

■ Hence, we conclude the trial court did not abuse its discretion by admitting this evidence as an excited utterance.[3]

---

[2] The record only shows that *after* Rachel accused Saracoglu of assaulting and threatening her, Hawkins asked if she wanted an emergency protective order. For the rest, we only know the substance of what Rachel told Hawkins, not the form it took.

[3] Saracoglu claims that, even if Rachel's statements were proper under Evidence Code section 1240, their admission violated his Sixth Amendment right to confrontation because excited utterances are not a firmly rooted exception to the hearsay rule. However, in the aftermath of *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] and *Davis v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266], the kind of reliability analysis utilized by *Ohio v. Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531], has been disapproved. "[The Supreme Court] has made clear that *Roberts* . . . and its progeny are overruled for all purposes, and retain no relevance to a determination whether a particular hearsay statement is admissible under the confrontation clause. As the court indicated in *Davis*, '[i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, *is not subject to the Confrontation Clause*.' [Citation.] Thus, there is no basis for an inference that, even if a hearsay statement is nontestimonial, it must nonetheless undergo a *Roberts* analysis before it may be admitted under the Constitution." (*People v. Cage* (2007) 40 Cal.4th 965, 981–982, fn. 10 [56 Cal.Rptr.3d 789, 155 P.3d 205], citation omitted.)

### b. *Rachel's statement did not violate the confrontation clause*

Saracoglu contends that even if Rachel's statement fell within the hearsay exception for spontaneous utterances, its admission violated his rights under the confrontation clause. We disagree.

#### (1) *Legal principles: from* Roberts *to* Crawford

"Under [*Ohio v. Roberts, supra,* 448 U.S. 56], an unavailable witness's hearsay statement could be admitted without violating the Sixth Amendment's confrontation clause if the statement bore adequate indicia of reliability—if it either fell within a firmly rooted hearsay exception or bore particularized guarantees of trustworthiness. [Citation.] However, [in *Crawford v. Washington*] the high court . . . reconsidered its ruling in *Roberts,* concluding that if the hearsay statement offered for its truth was testimonial in nature, its admission would violate the confrontation clause . . . unless the defendant had had a prior opportunity to cross-examine the now-unavailable declarant." (*People v. Price* (2004) 120 Cal.App.4th 224, 237 [15 Cal.Rptr.3d 229].)

In *Crawford v. Washington, supra,* 541 U.S. 36, Crawford's wife Sylvia had been interrogated as a suspect in connection with Crawford's killing of the victim. At trial, Sylvia did not testify and the prosecution used her police statement to impeach Crawford's self-defense claim. The Supreme Court held this violated the confrontation clause because Sylvia's statement had been testimonial: "Sylvia Crawford made her statement while in police custody, herself a potential suspect in the case. Indeed, she had been told that whether she would be released 'depend[ed] on how the investigation continues.' [Citation.] In response to often leading questions from police detectives, she implicated her husband in [the victim's] stabbing and at least arguably undermined his self-defense claim." (541 U.S. at p. 65.) "We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." (*Id.* at p. 68, fn. omitted.)

#### (2) *Legal principles: from* Crawford *to* Davis

The Supreme Court began the process of elaborating a comprehensive definition of "testimonial" in *Davis v. Washington, supra,* 547 U.S. 813 [126 S.Ct. 2266], which involved two separate cases, *Davis* and *Hammon v. Indiana.*

(a) *The* Davis *case*

In *Davis*, Michelle McCottry initially told a 911 operator her boyfriend was assaulting her with his fists, and then said he had left the house and fled in a car. In between these two statements, the 911 operator asked McCottry a series of questions, including her boyfriend's name. McCottry did not testify at Davis's trial for violating a domestic violence no-contact order, and the trial court admitted a recording of this portion of the 911 call over Davis's confrontation clause objection.

The Supreme Court characterized McCottry's conversation with the 911 operator as an interrogation because 911 operators are "agents of law enforcement when they conduct interrogations of 911 callers."[4] (*Davis v. Washington, supra*, 547 U.S. at p. 823, fn. 2 [126 S.Ct. at p. 2274, fn. 2].) The Supreme Court then explained how this interrogation differed from the one in *Crawford*. "The question before us in *Davis* . . . is whether, objectively considered, the interrogation that took place in the course of the 911 call produced testimonial statements. When we said in *Crawford* . . . that 'interrogations by law enforcement officers fall squarely within [the] class' of testimonial hearsay, we had immediately in mind (for that was the case before us) interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator. The product of such interrogation, whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer, is testimonial. . . . A 911 call, on the other hand, and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." (*Davis v. Washington, supra*, 547 U.S. at p. 827 [126 S.Ct. at p. 2276], citation omitted.)

"The difference between the interrogation in *Davis* and the one in *Crawford* is apparent on the face of things. In *Davis*, McCottry was speaking about events *as they were actually happening*, rather than 'describ[ing] past events,' [citation]. Sylvia Crawford's interrogation, on the other hand, took place hours after the events she described had occurred. Moreover, any reasonable listener would recognize that McCottry (unlike Sylvia Crawford) was facing

---

[4] "If 911 operators are not themselves law enforcement officers, they may at least be agents of law enforcement when they conduct interrogations of 911 callers. For purposes of this opinion (and without deciding the point), we consider their acts to be acts of the police. As in *Crawford* . . . therefore, our holding today makes it unnecessary to consider whether and when statements made to someone other than law enforcement personnel are 'testimonial.' " (*Davis v. Washington, supra*, 547 U.S. at p. 823 [126 S.Ct. at p. 2274, fn. 2], citation omitted.)

an ongoing emergency. Although one *might* call 911 to provide a narrative report of a crime absent any imminent danger, McCottry's call was plainly a call for help against [a] bona fide physical threat. . . . [T]he nature of what was asked and answered in *Davis*, again viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past. That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon. [Citation.] And finally, the difference in the level of formality between the two interviews is striking. Crawford was responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers; McCottry's frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." (*Davis v. Washington, supra,* 547 U.S. at p. 827 [126 S.Ct. at pp. 2276–2277].)

"We conclude from all this that the circumstances of McCottry's interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency. She simply was not acting as a *witness*; she was not *testifying.* . . . No 'witness' goes into court to proclaim an emergency and seek help." (*Davis v. Washington, supra,* 547 U.S. at p. 828 [126 S.Ct. at p. 2277].) "This is not to say that a conversation which begins as an interrogation to determine the need for emergency assistance cannot . . . 'evolve into testimonial statements,' [citation] once that purpose has been achieved. In this case, for example, after the operator gained the information needed to address the exigency of the moment, the emergency appears to have ended (when Davis drove away from the premises). The operator then told McCottry to be quiet, and proceeded to pose a battery of questions. It could readily be maintained that, from that point on, McCottry's statements were testimonial, not unlike the 'structured police questioning' that occurred in *Crawford.* . . . This presents no great problem. Just as, for Fifth Amendment purposes, 'police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect' [citation], trial courts will recognize the point at which, for Sixth Amendment purposes, statements in response to interrogations become testimonial." (*Ibid.*)

(b) *The* Hammon *case*

In *Hammon* (the companion case to *Davis*), officers responding to the report of a domestic disturbance found Amy Hammon alone on her front porch. She appeared frightened, but told the officers there was nothing wrong.

Her husband, who was inside the house, said they had argued but that everything was fine now. Amy came back inside and one officer spoke with her, while the other officer spoke to her husband in another room. This time, Amy said she had been assaulted. After hearing her account, the officer had her fill out and sign an affidavit. When Amy did not appear at her husband's trial for domestic battery, the trial court allowed the officer to testify about what Amy said had happened.

The Supreme Court held this hearsay use of Amy's police statement violated the confrontation clause. "Determining the testimonial or nontestimonial character of the statements that were the product of the interrogation in *Hammon* is a much easier task [than in *Davis*], since they were not much different from the statements we found to be testimonial in *Crawford*. It is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct—as, indeed, the testifying officer expressly acknowledged [citation]. There was no emergency in progress; the interrogating officer testified that he had heard no arguments or crashing and saw no one throw or break anything [citation]. When the officers first arrived, Amy told them that things were fine [citation], and there was no immediate threat to her person. When the officer questioned Amy for the second time, and elicited the challenged statements, he was not seeking to determine (as in *Davis*) 'what is happening,' but rather 'what happened.' Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime—which is, of course, precisely what the officer *should* have done." (*Davis v. Washington, supra,* 547 U.S. at p. 830 [126 S.Ct. at p. 2278].)

"It is true that the *Crawford* interrogation was more formal. It followed a *Miranda* warning, was tape-recorded, and took place at the station house [citation]. While these features certainly strengthened the statements' testimonial aspect—made it more objectively apparent, that is, that the purpose of the exercise was to nail down the truth about past criminal events—none was essential to the point. It was formal enough that Amy's interrogation was conducted in a separate room, away from her husband (who tried to intervene), with the officer receiving her replies for use in his 'investigat[ion].' . . . Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial." (*Davis v. Washington, supra,* 547 U.S. at p. 830 [126 S.Ct. at p. 2278, fn. omitted].)

"Although we necessarily reject the . . . implication that virtually any 'initial inquiries' at the crime scene will not be testimonial [citation], we do

not hold the opposite—that *no* questions at the scene will yield nontestimonial answers. We have already observed of domestic disputes that '[o]fficers called to investigate . . . need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim.' [Citation.] Such exigencies may *often* mean that 'initial inquiries' produce nontestimonial statements. But in cases like this one, where Amy's statements were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, the fact that they were given at an alleged crime scene and were 'initial inquiries' is immaterial. [Citation.]" (*Davis v. Washington, supra*, 547 U.S. at p. 832 [126 S.Ct. at p. 2279].)

### (c) *The rule of* Davis

■ The Supreme Court offered the following summation of its reasoning in *Davis*: "Without attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: *Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.* They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis v. Washington, supra*, 547 U.S. at p. 822 [126 S.Ct. at pp. 2273–2274], italics added, fn. omitted.)

■ Our own Supreme Court, analyzing *Davis* in *People v. Cage, supra*, 40 Cal.4th 965, said: "We derive several basic principles from *Davis*. First, . . . the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not

testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*Id.* at p. 984, fns. omitted.)

### (3) *Rachel's initial interrogation statements were nontestimonial.*

Saracoglu argues Rachel's "statements are akin to those in *Hammon*. Following the alleged domestic violence incident, [Rachel] packed up her child and drove [*sic*][5] to the police station to report the offense. She arrived at the police station approximately thirty minutes after the alleged offense. When she arrived at the police station, there was no ongoing emergency and there was no imminent threat of danger. Rather, she was in the safety of the police station. After Rachel presumably made initial statements to the person tending the desk,[6] Officer Hawkins and his partner . . . , who were working in the field, were summoned by dispatch to report to the station for a 'domestic violence investigation.' When the officers arrived at the station, they commenced their investigation and asked Rachel questions as part of an investigation into *past conduct*." Saracoglu asserts "the record affirmatively demonstrates that when [the officers] commenced their interrogation, there was no ongoing emergency and their sole purpose in questioning [Rachel was] to establish or prove past events relevant to an eventual criminal proceeding."

The Attorney General agrees: "[T]he primary purpose of the police questioning of Rachel Saracoglu was not to meet an ongoing emergency. Although the evidence established that she was in a bad state emotionally, she had removed herself from her home and from the defendant and had taken herself to the police station where she met with two officers who had been called back to the station for a domestic violence investigation. These circumstances, like *Hammon* and unlike *Davis*, objectively indicate that there was no ongoing emergency, and that the primary purpose of the interrogation was to establish or prove past events potentially relevant to later criminal prosecution. [Citation.] Therefore, under the compulsion of the *Davis* decision, it appears that Ms. Saracoglu's statements were testimonial in nature."[7]

We respectfully disagree with these arguments. Although the situation here falls somewhere in between the facts of *Davis* and the facts of *Hammon*, we

---

[5] As noted, above, it is not clear from the record how Rachel got to the police station.

[6] Presumably she did, but there was no evidence at trial regarding this conversation.

[7] While conceding this issue, the Attorney General contends this case must still "be remanded to the trial court for a determination whether the victim's nonappearance at trial was the result of intimidation or coercion on the part of appellant and, therefore, whether appellant forfeited his constitutional right to confrontation by wrongdoing." We need not reach this issue because we find that Rachel's initial statements to Officer Hawkins were not testimonial within the meaning of *Davis*.

conclude Rachel's initial conversation with Officer Hawkins was closer to *Davis* than to *Hammon*. Objectively viewed, the primary purpose of Rachel's initial interrogation by Hawkins was "to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*People v. Cage, supra*, 40 Cal.4th at p. 984.)

The record does not indicate what questions, if any, Hawkins asked Rachel; Hawkins testified only that, *after* hearing Rachel's account of the incident, he asked if she wanted an emergency protective order. Not knowing precisely how Rachel's initial account was elicited does not alter the analysis. As *Davis* said, "Although one *might* call 911 to provide a narrative report of a crime absent any imminent danger, McCottry's call was plainly a call for help against [a] bona fide physical threat. . . ." (*Davis v. Washington, supra*, 547 U.S. at p. 827 [126 S.Ct. at p. 2276].) Here, too, Rachel's initial statement to Hawkins was plainly a plea for help in the face of a bona fide physical threat.

The fact Rachel went directly to the police station instead of calling 911 does not, in our view, alter the analysis either. Under the facts of this case, Rachel's trip to the station was, in effect, the functional equivalent of making a 911 call. This conclusion is consistent with *Davis*'s characterization of 911 operators as "agents of law enforcement when they conduct interrogations of 911 callers." (*Davis v. Washington, supra*, 547 U.S. at p. 823, fn. 2 [126 S.Ct. at p. 2274, fn. 2].) Under the unusual facts of this case, it just happened that Rachel's plea for assistance was made to a police officer rather than a 911 operator.

Unlike Amy in *Hammon*, Rachel did not initially tell Hawkins there was nothing wrong. On the contrary, she told him her husband had assaulted her and then threatened to kill her if she went to the police. Unlike Amy, Rachel did not remain at home with her assailant; she took her child, fled to a police station and asked for help. Although Rachel was not, as McCottry had been doing in *Davis*, describing an assault as it was taking place, her situation was not like *Hammon*, where police had arrived on the scene and were talking to Amy and her husband in separate rooms. Saracoglu argues there was no ongoing emergency because Rachel had reached a place of safety and, therefore, was not facing any imminent harm. We disagree. The safety of the station house was only temporary because Rachel could not go home again until the situation was resolved. The emergency was ongoing because Saracoglu had threatened to kill Rachel if she went to the police.[8]

---

[8] After *Davis*, some courts have found ongoing emergencies in domestic violence cases even where the victim had gained some measure of temporary safety. (See *State v. Wright* (Minn. 2007) 726 N.W.2d 464, 474–475 [emergency not necessarily over once police arrived and began to pursue assailant, who had fled before 911 call was made but who had keys to victim's

We conclude the evidence shows Rachel's primary purpose for making her initial statements to Hawkins was to gain police protection. She "was not acting as a *witness*; she was not *testifying*. . . . No 'witness' goes into court to proclaim an emergency and seek help." (*Davis v. Washington, supra,* 547 U.S. at p. 828 [126 S.Ct. at p. 2277].) Faced with an obviously distraught woman, who was crying, shaking and very afraid, Hawkins's primary purpose was to ascertain what was going on. In doing so, Hawkins elicited the information he needed to understand Rachel's situation and to take action "to *resolve* the present emergency." (*Id.* at p. 827 [126 S.Ct. at p. 2276].) These circumstances show the primary purpose of Hawkins's interrogation was not to "establish or prove past events potentially relevant to later criminal prosecution" (*id.* at p. 822 [126 S.Ct. at p. 2274]), but rather "to enable police assistance to meet an ongoing emergency" (*id.* at p. 822 [126 S.Ct. at p. 2273]), which, to paraphrase *Davis* again, was "precisely what the officer *should* have done"[9] (*id.* at p. 830 [126 S.Ct. at p. 2278]).

Rachel's account to Officer Hawkins of having been assaulted and threatened by Saracoglu was nontestimonial within the meaning of *Davis*, and therefore its admission at Saracoglu's trial was not a confrontation clause violation.

[[/]]*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

apartment]; *State v. Kemp* (Mo. 2007) 212 S.W.3d 135, 149 [emergency ongoing where neighbors found victim running half-naked in the street, took her to their house and called 911, because defendant's exact location was unknown and available information was that defendant "was armed, had been smoking crack, and had been holding [victim] at gunpoint all night"]; *U.S. v. Arnold* (6th Cir. 2007) 486 F.3d 177, 190 [emergency ongoing where victim left house and got into her car before making 911 call: "At the time she made the call, [the victim] had no reason to know whether Arnold had stayed in the residence or was following her. What she did know is that he had a gun; he had just threatened her; he was still in the vicinity . . . ."].)

[9] That Hawkins may have *subsequently* initiated a formal domestic violence investigation, by taking pictures of Rachel's injuries and asking if she wanted a protective order, did not render the interrogation testimonial *ab initio*. (See *Davis v. Washington, supra,* 547 U.S. at p. 828 [126 S.Ct. at p. 2277] [conversation that begins as nontestimonial interrogation to determine need for emergency assistance can " 'evolve into testimonial statements' "].) In any event, the record demonstrates any inculpatory evidence arising from these later interactions was merely cumulative to the admissible evidence of Rachel's initial statements.

*See footnote, *ante*, page 1584.

## DISPOSITION

The judgment is affirmed.

Croskey, J., and Aldrich, J., concurred.

A petition for a rehearing was denied July 30, 2007, and appellant's petition for review by the Supreme Court was denied October 31, 2007, S155491.