Filed 8/18/14  P. v. Pinson CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DEREK PINSON,<br><br>    Defendant and Appellant. | B246205<br><br>(Los Angeles County<br>Super. Ct. No. MA054992) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daviann Mitchell, Judge.  Affirmed.

G. Martin Velez, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, William H. Shin and Peggy Z. Huang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Derek Pinson appeals his 13 convictions, claiming that his *Marsden*[1] motion for replacement of his appointed counsel was erroneously denied; that the court violated his constitutional rights to counsel and due process by denying newly retained counsel time to prepare for trial; and that a 911 call was erroneously admitted into evidence. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Pinson was charged with 14 violations of the Penal and Vehicle Codes. On July 25, 2012, the day before jury selection was to commence, he requested that his appointed counsel be replaced pursuant to *Marsden*, *supra*, 2 Cal.3d 118. The court conducted an in camera hearing into Pinson's complaints about his counsel, and then denied the motion. Pinson told the court that he wanted to represent himself if he was not appointed new counsel. The court discussed this request in detail with Pinson, then gave him time to consult with counsel and an evening to consider whether he wished to represent himself.

The following morning, July 26, 2012, Pinson chose to represent himself and told the court he was ready for trial. Jury selection began that day, and was scheduled to resume on Monday, July 30, 2012. On Monday morning, Pinson did not appear, but attorney Craig Elkin informed the court that he intended to move to substitute in as retained counsel later that day. The court advised Elkin that it would not permit him to substitute in at such a late date unless Elkin could represent that he was ready for all purposes and to step in that day. While Elkin did advise the court that he was ready for trial, he also asked if he could move for a continuance later that day when he formally substituted in as counsel. The court gave permission, saying, "You certainly may. [¶]. . . [¶] Okay. I just want your client here when we do that." In the later session, the court permitted Elkin to substitute in as counsel. Elkin did not move for a continuance.

---

[1] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

2

During the prosecution's presentation of evidence at trial, the prosecution introduced a recording of a 911 telephone call made by a witness to a car theft. Pinson objected on hearsay grounds. The court permitted the recording to be played to the jury because it believed the statements to be admissible for a nonhearsay purpose, and advised counsel to present any further objection after the recording had been played. Pinson did not object to the recording after it was played.

Pinson was convicted of 13 of 14 counts, with the final count dismissed in the interest of justice. Pinson appeals.

## DISCUSSION

### I.     *Marsden* Motion

Pinson argues that the court failed to conduct a proper inquiry into an irreconcilable conflict between himself and counsel when it heard his motion to replace appointed counsel pursuant to *Marsden*, *supra*, 2 Cal.3d 118. We review the ruling on a *Marsden* motion for an abuse of discretion. (*People v. Jones* (2003) 29 Cal.4th 1229, 1245 (*Jones*).) We have reviewed the motion and transcript of the hearing and find no abuse of discretion.

Pinson filed a written motion seeking the replacement of his appointed counsel, Michael Morse. He alleged that Morse had failed to (1) investigate and prepare the case adequately; (2) include relevant information and an affidavit in the motion to set aside the information pursuant to Penal Code section 995; (3) request and receive full formal discovery; (4) vigorously raise the issue of discrepancies and contradictions in the evidence; and (5) provide mitigating evidence to obtain a lesser sentence.

During the *Marsden* hearing, the trial court addressed each of these complaints in turn. With respect to the alleged failure to investigate and prepare the case adequately, Pinson was unable to identify any respect in which Morse had failed to investigate or prepare the case. He complained that there was information he wanted presented in the motion to set aside the information and that he believed he had not personally received all

3

the discovery in the case from Morse, both of which the court observed were distinct from the issue of preparation and investigation. The court asked whether he had asked counsel if he had all the discovery, and Pinson represented that counsel had confirmed he did. The court asked, "So what did he not investigate that you asked him to investigate?" Pinson said, "[W]hy they would go off . . . what the officers said and not what I—what I had to say." The court asked Pinson what he thought counsel could do to investigate why the court made a particular ruling, and Pinson responded that other information should have been presented to the court.

The court asked Pinson if he was unhappy that counsel was "not tactically doing what you want him to do," and Pinson replied affirmatively. "So you don't mean to say failure to investigate," said the court. "What I think you're meaning to say, if I'm understanding you, is the tactic he's chosen on the [Penal Code section] 995 [motion] is not the way you would like him to have done it." Pinson agreed, and confirmed that he was unhappy not about the investigation but about his belief that Morse should have presented other information and an affidavit in the motion to set aside the information. Pinson described what he had told his counsel he wanted in the motion and complained that Morse had said there was no reason to include that information in the motion. The information, however, pertained to other criminal acts by Pinson, leading the court to question whether it should properly have been included in the motion; Pinson advised that he had previously revealed this conduct so it was in the record.

Next, the court asked Pinson to explain his complaint that Morse had failed to request and receive full formal discovery including, as stated in the written *Marsden* motion: MDT (mobile data terminal) transmissions; radio dispatches; complete incident, supplemental, and narrative reports of all officers; copies of photographs; stolen vehicle reports, tow reports, descriptions, and vehicle identification numbers; and any and all notes, documents, or other items related to the charges. Pinson told the court that he had received discovery from his counsel, but that there were missing pages. The court asked Pinson whether he asked Morse for MDT transmissions, and Pinson admitted he had not

4

asked about them. "So when you say that you didn't receive it and it wasn't requested, you never even asked him if it was received and it was requested," said the court. "I asked him for all my paperwork," replied Pinson. The court asked Pinson whether he knew what MDT transmissions were, and Pinson said he did not. Pinson then explained that he had asked his mother to draft a *Marsden* motion and that this was what she had written for him.

The court asked Pinson to state in his own words what discovery he requested but did not receive. Pinson said he asked for his full discovery, including pictures, reports from the officers, videos, and witness statements, but he admitted he had no idea whether there were videos. Pinson had asked Morse about videos, and Morse had said he would look into it, but Morse never told him anything further about it, Pinson stated. At the same time that Pinson maintained that he did not have the full reports, he admitted that Morse had told him that he (Pinson) had all the discovery. Pinson complained he did not have photographs, but acknowledged that he had never asked Morse specifically about photographs.

The court turned to Pinson's assertion that Morse had failed to address conflicts in the evidence. Pinson explained in detail the evidentiary conflict he believed significant. Because trial had not yet begun, the court asked when Pinson thought counsel should have presented this argument about the evidence. Pinson thought it should have been raised in plea negotiations, and the court noted that the plea offer made by the prosecutor was less than half the potential prison term for the charged offenses, "so it sounds to me like there must have been some level of negotiation." "It's done nothing but gone up since my first," complained Pinson. The court reminded Pinson that it had advised him that plea offers are best when they represent an early acknowledgment of responsibility. Pinson said he would plead guilty to some of the charges but not others. The court asked what he wanted counsel to do if the prosecutor was not willing to accept that proposal, and Pinson said, "Go to trial with me and—and—and just do what I ask." The court said, "So you're saying that his tactics are not the way you would like them to be." Pinson

5

said, "[T]here's certain things that I asked him if he could do or say or—or—or ask and very few—I mean there's—there's—there's been just very few that he has."

The trial court next asked Pinson about his allegation that Morse had not presented mitigating circumstances to obtain a lesser sentence, wanting to know what he thought Morse should have done in this regard given that trial had not yet occurred and he had not entered an "open" plea. Pinson said his counteroffer was "a program," but the court observed that the prosecutor had rejected Pinson's proposal and asked what Pinson wanted Morse to do in light of that rejection. Pinson told the court he did not want to take the offer that had been made by the prosecutor and that he wanted to go to trial.

Pinson said, "I don't feel like he's doing his best to represent me. I don't feel—I don't feel like it's benefiting me any—in any ways." The court asked Pinson whether there was anything else he wanted the court to know in considering his request for new appointed counsel. Pinson replied, "I believe that I deserve the right to have somebody represent me that—with my life in their hands to represent me as fair as possible."

Morse then addressed each complaint raised by Pinson, explaining what he had done in discovery and investigation, setting forth the reasons for his tactical choices, and describing plea negotiations. The court credited Morse's representations. The court noted that Pinson had not asked with particularity about a number of items, and that when Pinson did request specific items, Morse affirmed that he had turned over everything to Pinson. The court found Morse's investigation to be adequate and observed that Morse could not bring about Pinson's desired resolution of the charges because the prosecution had rejected Pinson's proposal of enrollment in a program. The court noted that the tactical disagreements were not a basis for relieving counsel. The court, finally, found that there had not been a breakdown in the relationship between counsel and the defendant of such kind as would make it impossible for Morse to properly represent Pinson, and it denied the motion.

The court did not abuse its discretion. The court inquired extensively into Pinson's concerns about counsel's representation, asking Pinson to explain his

6

complaints in his own words once he disclosed he was not the author of his *Marsden* motion. The court gave Pinson a full opportunity to advise the court of his grievances and fully explored each subject Pinson raised. Pinson did not identify any respect in which counsel's performance had been deficient: he offered no specific instances of failure to perform duties adequately or failure to investigate or prepare. At their core, Pinson's complaints were tactical in nature, as he was unhappy that Morse was not handling motion practice, plea negotiations, and argument the way he wanted Morse to conduct them. This belief that Morse was not "do[ing] what I ask" appeared to be the basis for Pinson's view that Morse was not doing his best or representing him fairly. "[D]efendant's complaints regarding [counsel's] purported inadequate investigation, trial preparation, and trial strategy were essentially tactical disagreements, which do not by themselves constitute an irreconcilable conflict." (*People v. Cole* (2004) 33 Cal.4th 1158, 1192.) Pinson did not complain about his interactions or relationship with counsel beyond these tactical disagreements, and nothing Pinson said expressed or implied that he and Morse experienced an irreconcilable conflict or relationship breakdown that would make it impossible for Morse to properly represent Pinson. "[A] defendant's claimed lack of trust in" appointed counsel is not sufficient to compel appointment of substitute counsel. (*Jones*, *supra*, 29 Cal.4th at p. 1246.)

Pinson argues that the court should have "probe[d] more deeply into the nature" of his relationship with counsel, relying on *U.S. v. Adelzo-Gonzalez* (9th Cir. 2001) 268 F.3d 772, 778. The two cases are fundamentally dissimilar. In *Adelzo-Gonzalez*, there were "striking signs of a serious conflict" between the defendant and counsel: the defendant advised the court they could not get along and that counsel had threatened him with a huge sentence to keep him from his family, did not pay attention to him, and used bad language toward him. (*Id*. at p. 778.) Counsel attempted to prevent Adelzo-Gonzalez from making a motion at the final pretrial hearing, openly called him a liar, and asserted that Adelzo-Gonzalez had been coached or might be feigning ignorance. (*Ibid*.) Nothing similar occurred here: counsel did not interfere with Pinson's attempts to

7

present his complaints to the court, and none of Pinson's statements indicated any disparagement, threats, or improper conduct. While Pinson argues that the cases are alike in that the court in both cases "focused on counsel's competence and capacity to provide adequate representation" (*ibid.*), the transcript of the hearing reflects that the court delved further into Pinson's concerns about counsel and the reason for his motion than it did into counsel's representation of Pinson and his professional experience. More than fourteen pages of the hearing transcript were devoted to the court exploring Pinson's grievances, while the court spent less than eight pages on Morse's explanation of his representation and the presentation of his professional record. Here, the court satisfied its duty of inquiry when it asked Pinson to explain the nature of his concerns, gave him a full opportunity to state and explain all issues, and read and considered the motion presented. (See *People v. Silva* (2001) 25 Cal.4th 345, 367 [court's duty of inquiry satisfied when the judge "asked defendant three times to state the grounds of his motion, never interrupted defendant's explanation, and read and considered the letter that defendant submitted"].) Pinson has not established any deficiency in the court's inquiry or any error in the court's denial of his *Marsden* motion.

## II.     Substitution of Counsel

After jury selection had begun and while Pinson was representing himself, attorney Elkin advised the court at a morning session not attended by Pinson that he would move to substitute in as counsel that afternoon. The court asked, "Are you prepared to go to trial today? We are in the middle of jury selection, and it will be the court's indicated not to allow a substitution this late unless you can announce 'ready' for all purposes and step in today." Elkin responded, "I understand that, Your Honor, and I will be announcing 'ready' in those terms." He told the court that "[b]eing 'ready' is a word of art with respect to the trial, but with respect to the court's definition, I will answer 'ready.'" The court advised counsel that "with that representation" it would permit the substitution at the afternoon session when Pinson arrived in court. Elkin then

asked, "And may I at least for the record at 2:30 make the formal or an oral motion that I trust will be denied?" The court clarified that Elkin meant a request for a continuance, and told Elkin that he could make that motion once Pinson was present. The court said, "You certainly may. [¶]. . . [¶] Okay. I just want your client here when we do that."

That afternoon, Pinson confirmed that he wished Elkin to substitute in as counsel. The court repeated that it was willing to permit the substitution as long as Elkin was prepared to continue with jury selection and trial. Elkin wavered on his level of preparedness, referring again to "words of art," and said that he "couldn't consciously say I'm ready at this moment, but I will be. [¶] As far as the court's own definition of that . . . my client wants me to be for him, and I'm therefore within the court's definition ready to go." The court was unwilling to accept equivocation, telling Elkin, "[M]y definition is you are legally ready for all purposes, not a qualified, 'It's a term of art,' and, 'I'm not really ready, but I can be,' and 'I'm getting up to speed.' That will not satisfy this court. You have to say, 'Your Honor, I am ready on all matters for all purposes to step in right now,' and if I were to bring the jury up continue with jury selection."

After further discussion, the court asked Elkin, "[A]re you ready for all purposes?" Elkin answered, "Yes. And I will endeavor to collect all that I'm missing." The court responded, "So you're indicating you are ready for all purposes within the legal meanings—" and Elkin interrupted, "Yes." "For trial," the court continued. "Yes. Yes," confirmed Elkin.

Elkin then pointed out that he was missing a portion of the preliminary hearing transcript, and the court said, "Okay. That's your issue. If [you are] saying you're willing to announce ready only having a partial transcript, then that's up to you and between you and your client and your legal bar card, not the court's issue." The court continued, advising Elkin, "I know you have all the discovery, and the defendant confirmed on Friday [there] was provided to him a duplicate copy even though [appointed counsel] had already previously provided all the discovery to him." The court

9

allowed that something could be missing, but said, "[Y]ou have to simply tell me you are ready for trial knowing you may be missing some of the discovery." Elkin answered, "Yes. I am ready for trial knowing I'm missing some of the discovery." The court permitted Elkin to substitute in as counsel, allowed a recess for plea negotiations, and then resumed voir dire. Elkin did not request a continuance.

Pinson argues that "the trial court interfered with appellant's right to counsel because it did not grant a continuance to provide E[lkin] reasonable time to prepare the defense." While Elkin, before he substituted in as counsel, had obtained the permission of the court to move for a continuance later that day once Pinson was present, from the transcript of that later session it appears he never did so.[2] The court cannot have erred in failing to grant a continuance that was never requested. Pinson forfeited any claim of error in denial of a continuance when he did not seek one in the trial court. (*People v. Riccardi* (2012) 54 Cal.4th 758, 810.)

### III.    Admission of 911 Call

In a claim that pertains only to the conviction on count 18, a violation of Vehicle Code section 10851, subdivision (a), Pinson claims that the trial court erred in admitting the recording of a 911 call made by a witness reporting the crime in progress. Pinson objected to the evidence as hearsay. The court preliminarily overruled the objection, advising the jury that if the proper foundation was established, the recording would be admissible as a series of spontaneous statements, although if the defense objected to the recording once it had been played, the court would address the objection at that time. The court advised the jury that in any event, the recording would be admitted for the

---

[2]    In his reply brief, Pinson asserts that the combination of Elkin's pre-substitution request that the court allow him to move for a continuance later that day and his later statement, "I couldn't consciously say I'm ready at this moment, but will be," constituted a request for a continuance. Neither statement, whether considered separately or together, constituted a request to delay the proceedings.

nonhearsay purpose of understanding the state of mind and the subsequent conduct of the police. After the recording was played, Pinson did not make any further objection.

On appeal, Pinson argues that the statements in the 911 recording cannot be considered spontaneous statements under Evidence Code section 1240 and that they were not admissible to explain police conduct or state of mind because such conduct was not at issue at trial. Given that the court advised Pinson that he could raise any objection to the recording after it had been played, and he did not make any objections at that time or press for a ruling on his earlier objection, there is serious doubt that Pinson preserved the issue for appeal. (Evid. Code, § 353, subd. (a); *People v. Saunders* (1993) 5 Cal.4th 580, 589-590; *People v. Valdez* (2012) 55 Cal.4th 82, 142-143.) Assuming for the sake of argument that Pinson's initial objection was sufficient to preserve his claim, we find no error here.

The decision whether to admit hearsay evidence under this exception falls within the trial court's broad grant of judicial discretion (*People v. Hines* (1997) 15 Cal.4th 997, 1034-1035, fn. 4), and the court did not abuse its discretion in concluding that the recording contained spontaneous statements. Evidence Code section 1240 provides that evidence of a statement is not made inadmissible by the hearsay rule if the statement purports to narrate, describe, or explain an act, condition, or event perceived by the declarant, and was made spontaneously while the declarant was under the stress of excitement caused by such perception. Here, the 911 caller described to the emergency dispatcher that he was watching people breaking into a car in front of his house, and he narrated the events that unfolded before him. The caller's statements demonstrated that he was experiencing stress: he did not want to give the dispatcher his address out of concern that the police would reveal that he was the one who made the 911 call, and he would not go outside the house because he did not want the people breaking into the car to see him. The trial court could properly conclude that the statements of the witness during the 911 call qualified as spontaneous utterances.

11

Pinson argues that the nature of the events the caller was observing was not one to produce the excitement necessary under the spontaneous statement rule, and he supports his argument by describing circumstances of a declarant's physical injury present in other cases in which statements were found to be spontaneous. While in many instances statements are deemed spontaneous when the declarant has been injured, there is no rule that unless a declarant was attacked or injured the circumstances are not sufficient to create the requisite stress of excitement for purposes of this exception to the hearsay rule. Pinson also argues that the statements were not spontaneous because the caller responded to questions from the dispatcher during the call. The fact the dispatcher asked questions designed to elicit more narrative from the caller does not necessarily negate the spontaneity of the caller's responses. (*People v. Brown* (2003) 31 Cal.4th 518, 541; *People v. Saracoglu* (2007) 152 Cal.App.4th 1584, 1590.) With these arguments Pinson has not established any abuse of discretion in the court's determination that the statements describing the ongoing crime were made spontaneously under the stress of excitement caused by the caller perceiving the events occurring in front of his house.[3]

---

[3]     Our determination that the court did not abuse its discretion in ruling that the 911 call was properly admitted as a spontaneous statement makes it unnecessary to address Pinson's contention that the call was not properly admitted for the nonhearsay purpose of establishing the responding officers' state of mind and subsequent conduct. Our review is confined to the correctness or incorrectness of the trial court's ruling, not its reasoning. (*People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12.)

## DISPOSITION

The judgment is affirmed.

ZELON, J.

We concur:

WOODS, Acting P. J.

SEGAL, J.[*]

_____

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.