Filed 5/8/15  P. v. Ramirez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E061080 |
| v. | (Super.Ct.No. FWV1300420) |
| ERNESTO RAMIREZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Stephan G. Saleson, Judge.  Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood, and Meagan J. Beale, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I

# INTRODUCTION[1]

Defendant and appellant Ernesto Duran Ramirez and a fellow gang member beat up another inmate while all were in custody in San Bernardino West Valley Detention Center. A jury convicted defendant of assault by means likely to cause great bodily injury and conspiracy (§§ 182, subd. (a)(1), and 245, subd. (a)(4)) and found true the criminal street gang allegations. (§ 186.22, subd. (b)(1).) Defendant admitted he had one prison prior. (§ 667.5, subd. (b).) The court sentenced him to nine years in prison.

On appeal, defendant offers little argument about the substantive offenses of assault and conspiracy. Instead, he challenges the admission of the victim's spontaneous statements about the gang-related nature of the crimes. We reject defendant's contentions and affirm the judgment.

# II

# FACTUAL STATEMENT

*A. The November 25, 2012 Incident*

On November 25, 2012, Britain Speakman, a San Bernardino County sheriff's deputy, and Jeanne Martin, a sheriff's custody specialist, were working at Unit 2 of the West Valley Detention Center, a county jail facility. Segment A of Unit 2 housed about 16 inmates per cell. Defendant and David San Miguel were inmates housed in cell No. 8. Humberto Cervantes was housed in cell No. 2.

---

[1] All statutory references are to the Penal Code unless stated otherwise.

Defendant and San Miguel had been released from their cells for showers at approximately 10:00 p.m. The showers were located about 45 feet from the "Johnson door," leading out of the unit. Martin observed defendant and San Miguel huddled together, talking.

When Martin released Cervantes's cellmate to obtain a snack for diabetes treatment, Cervantes left their cell without permission, carrying his mattress, towel, sheets, and other property. He approached the Johnson door, and pressed the intercom button. Martin asked Cervantes to state his business, and Cervantes said he was afraid and feared for his life, and that he needed to leave the cell or Segment A. Martin directed Cervantes to return to his cell but Cervantes requested protective custody before starting to return to his cell.

At that point, defendant and San Miguel attacked Cervantes. He dropped his property and fell down in a fetal position on the concrete floor. Defendant straddled Cervantes, punching him forcefully in the back of the head with a closed fist. San Miguel, on Cervantes's right side, punched him in the face. Cervantes did not have a weapon and did not hit back. Instead, he tried to protect his face.

Speakman testified that defendant and San Miguel hit Cervantes about 10 times. Martin testified Cervantes suffered at least eight blows to the head and defendant and San Miguel kicked Cervantes at least twice.

Speakman radioed a report of the fight and verbally commanded defendant and San Miguel to stop fighting. They continued to hit Cervantes until Speakman threatened to use pepper spray, and they stopped.

3

Another deputy, Christopher Hess, arrived to help manage the situation. Cervantes was scared and crying, with tears in his eyes, and a "quivering" lip. Hess asked Cervantes, "What's going on" and why he had all his property with him. Cervantes told Christopher Hess "he didn't want to be part of the Sureno gang, or the Southsiders, anymore, and because of the politics that was going on, he wanted to drop out, and he was targeted or green lighted, hit to be taken out, or hit basically."

After separating the inmates, Speakman observed redness on Cervantes's face but he did not see any injuries on defendant or San Miguel. In his report, Speakman described Cervantes's injuries as "minor," and the incident as involving a "battery." Later, Speakman completed an inmate injury report, in which he described Cervantes's injuries as minor bumps and bruises to the head and face.

Martin testified that she observed fresh injuries to Cervantes, including blood and broken skin, but that they were not black and blue, like bruises. Hess testified there was swelling on the left side of Cervantes's face, cheek, upper forehead, and nose, as well as cuts or lacerations on the right side of his face and near both ears. The examining nurse testified that she observed injuries to the left forehead and the front of the neck, which were consistent with some form of blunt trauma. The nurse monitored Cervantes for three days for head injuries. Photographs were also introduced of Cervantes's injuries.

B. Gang Evidence

The People's gang expert, Michael Martinez, testified the "Sureno" or "Southsider" gang uses a series of common signs or symbols, including the abbreviations "Sur" and "Trece," which mean "southern" and "13" in Spanish. Martinez explained the

4

county jail had problems with Hispanic gangs, whose members, when in custody, typically switch from a particular street gang to the prison gang that oversees the entire Hispanic or Sureno population. Inmate members are expected to follow certain rules involving assaults and narcotics coming into the prison. Those who do not obey are often targeted for assault.

Martinez estimated there were about 1,200 members of the Sureno gang in the San Bernardino County jail system as of November 2012, and the inmate gang members engaged primarily in extortion and assault. Martinez testified that the Onterio Varrio Sur gang "currently has control over our jail system."

According to pictures and eyewitness testimony, defendant had several tattoos on his body, including "I.E." on the neck and "Onterio" on the chest. According to Martinez, I.E. symbolized the Inland Empire, "a geographical area used by Hispanic street gangs," while "Onterio" was a spelling variant of "Ontario," and shorthand for Onterio Varrio Sur, an umbrella gang. Based on his experience, it was Martinez's opinion that defendant's tattoos indicated he was a member or strong associate of the gang. He also believed that San Miguel was a member of an Orange County gang, based on booking documentation.

Martinez had investigated and was familiar with several crimes committed by gang members, including a May 2010 assault for which defendant was convicted. It was Martinez's opinion that the current alleged offense was committed in a jail setting for the benefit of a criminal street gang. That opinion was based in part on statements made by the victim Cervantes, indicating that he wanted to disassociate himself from the gang and

5

as a result was being targeted by gang members, who used assault as a means of enhancing their reputation and solidifying their control over the prison system. In particular, Martinez believed that assaulting inmates in front of jail officials would benefit the gang, by displaying their willingness to act when needed on behalf of the gang, and by helping the gang gain notoriety within the jail and dissuade others from leaving the gang. Martinez's opinion was also based on defendant's prior conviction, the "kite" found in his cell, defendant's tattoos, and the gang clothing worn by defendant. The kite was a piece of paper with gang-style writing and references and commonly used to communicate with other gang inmates.

Martinez was not aware of any field interrogation cards issued to either defendant, San Miguel, or Cervantes, even though such cards were often used to identify gang members. He also conceded that not every person with I.E. or Onterio tattoos was necessarily a gang member, although he had not seen anybody with those tattoos who was not.

## C. The Defense Evidence

In October and November 2012, Cervantes was placed on suicide watch because he had made statements about hurting himself. Also in November 2012, after arguing with another inmate about items purchased from the jail commissary, Cervantes claimed he needed mental help, and was "controlled by spirits." Cervantes was disciplined for causing a major disturbance and taking a swing at another inmate. It was also stipulated that Cervantes had been convicted of auto theft and grand theft.

III

ADMISSION OF CERVANTES'S SPONTANEOUS UTTERANCE

As already noted, defendant does not contest his involvement in the attack but he urges the trial court abused its discretion by admitting Cervantes's statements to deputy Hess. Before trial, the People moved to admit the statements made by Cervantes that he did not want to be a Sureno or Southsiders gang member anymore because of "the politics" and that he believed he was "targeted" or "green lighted" to be "taken out" or hit. (Evid. Code, § 402.) The motion sought to admit those statements on the ground that they constituted "spontaneous statements" within the hearsay exception contained in Evidence Code section 1240. Defendant filed a cross-motion to exclude the statements, on the ground that they violated defendant's rights under the Confrontation Clause of the Sixth Amendment. After a hearing, the court permitted the subject statements to be admitted because they were "very spontaneous" and were not being offered for truth but to show Cervantes's state of mind, and they were reliable, being made immediately after the beating. The court also found the statements were not testimonial, within the meaning of the Sixth Amendment and recent United States Supreme Court decisions. During deliberations, the jury asked to review the testimony about what Cervantes had said.

Evidence Code section 1240 provides that "[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such

7

perception." The rationale for permitting admission of so-called "spontaneous statements" as an exception to the rule against hearsay is that the stress of nervous excitement may overcome the reflective faculties of the declarant, such that the declarant has had no opportunity to fabricate a false story, and the utterance becomes the "'instinctive and uninhibited expression of the speaker's actual impressions and belief.'" (*People v. Clark* (2011) 52 Cal.4th 856, 925; *People v. Farmer* (1989) 47 Cal.3d 888, 903-904, disapproved on other grounds by *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6; *People v. Poggi* (1988) 45 Cal.3d 306, 318.)

The crucial element of admissibility is not the nature of the statement but the mental state of the speaker. (*People v. Blacksher* (2011) 52 Cal.4th 769, 817, citing *People v. Farmer, supra*, 37 Cal.3d at pp. 903-904.) First, there must be some occurrence startling enough to produce nervous excitement and render the utterance spontaneous and unreflective; second, the utterance must be made before there has been time to contrive and misrepresent, i.e. while the nervous excitement still dominated; and, third, the utterance must relate to the circumstance of the preceding occurrence. (*People v. Morrison* (2004) 34 Cal.4th 698, 718; *Farmer,* at pp. 901, 904.)

The declarant need not be unavailable as a witness in order to introduce evidence of his spontaneous statement. However, the admissibility of such statements are subject to the state and federal constitutional requirements providing criminal defendants with the right to confront the witnesses against them. Where a spontaneous statement may be considered "testimonial" in character, it is inadmissible unless the declarant is subject to

cross-examination at trial. (*Crawford v. Washington* (2004) 541 U.S. 36; *Davis v. Washington* (2006) 547 U.S. 813.)

The Court in *Davis* defined the test to determine whether an interrogation was "testimonial" or "nontestimonial" hearsay: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis v. Washington, supra,* 547 U.S. at p. 822.)

The trial court's discretion governs admissibility. (*People v. Byron* (2009) 170 Cal.App.4th 657, 675, citing *People v. Saracoglu* (2007) 152 Cal.App.4th 1584, 1588, 1597 [instead of calling 911, victim went to police station to report spouse had assaulted and threatened to kill her, victim's initial statements to police were nontestimonial under *Crawford* because they were "a plea for help in the face of a bona fide physical threat"]; *People v. Brenn* (2007) 152 Cal.App.4th 166, 173, 177, 178 [victim's statements to 911 operator and responding officer were admissible under the excited utterance hearsay exception and nontestimonial under *Crawford*].)

Here the circumstances show that Cervantes's statements were admissible as a spontaneous utterance describing or explaining what happened while under the stress of excitement. Furthermore, his statements were admissible because they were not part of a police investigation and they were not testimonial.

9

Immediately after suffering the attack, Cervantes was extremely upset and in tears, his lip quivering, barely able to speak. Hess and the other deputies were still engaged in trying to control the situation. In response to Hess's three-word inquiry about "[w]hat's going on," Cervantes offered an explanation, conveying his actual impression and belief that his life was imminently threatened because he was not willing to participate in a gang. His statements did not constitute subjective speculation about why he was attacked. (*People v. Farmer, supra,* 47 Cal.3d at pp. 904-905.)

The case cited by defendant, *People v. Miron* (1989) 210 Cal.App.3d 580, is not applicable because it involved the interplay of the spontaneous utterance exception and the lay opinion rule. The defendant's wife had made a statement that the victim had tried to kill defendant. The appellate court upheld the trial court's discretionary decision to exclude the evidence as lay opinion and did not apply the *Farmer* rule involving spontaneous utterance: "The opinion rule excludes admission of a spontaneous statement of inadmissible opinion [citation], and such opinions or conclusions should be excluded even where the statement as a whole meets the requirements of Evidence Code section 1240" (*id.* at p. 583) and "*Farmer* did not change the rule that opinion testimony may properly be excluded even where the rest of the statement meets the requirements of Evidence Code section 1240." (*Id.* at p. 584.)

Instead, the present case is more comparable to *People v. Osorio* (2008) 165 Cal.App.4th 603, 614, in which an officer asked a victim what had happened during the chaotic aftermath of an incident. The informal, brief, unstructured exchange between the

officer and victim was not testimonial.  Applying the above principles, we hold the trial court did not abuse its discretion in allowing Cervantes's statements.

Furthermore, admission of the evidence was not prejudicial because it could not have plausibly affected the jury's true findings on the gang allegations.  It is undisputed that defendant and the other inmates were gang members.  The attack had all the hallmarks of gang culture and violence as it unfolds in a jail setting.  There is no reasonable doubt the jury would have made a different finding if the statements had been excluded.  (*People v. Pearson* (2013) 56 Cal.4th 393, 463.)

IV

DISPOSITION

The subject statements were spontaneous utterances and were not testimonial.  The trial court did not abuse its discretion in allowing them to be admitted.  We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

HOLLENHORST
Acting P. J.

MILLER
J.

11